UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WILLIAM HAUGHEY,

                              Plaintiff,

        v.

COUNTY OF PUTNAM, *et al.*,

                              Defendants.

No. 18-CV-2861 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Rita Dave, Esq.
Rita Dave PC
Brooklyn, NY
*Counsel for Plaintiff*

Kenneth E. Pitcoff, Esq.
Michael A. Czolacz, Esq.
Cristina A. Knorr, Esq.
Morris Duffy Alonso & Faley
White Plains, NY
*Counsel for Defendants Town of Carmel, Justin Fischer, Michael Nagle, Robert Behan, John
Dearman, and Joseph Charbonneau*

John S. Diaconis, Esq.
Peter F. Harrington, Esq.
Bleakley Platt & Schmidt, LLP
White Plains, NY
*Counsel for Defendant Daryl Johnson*

Jennifer A. Casey, Esq.
Ahmuty, Demers & McManus
Albertson, NY
*Counsel for Defendant Anthony Porto, Jr.*

KENNETH M. KARAS, United States District Judge:

        Plaintiff William Haughey ("Plaintiff") brings this Action against Defendants the County

of Putnam ("Putnam"); Robert Geoghegan ("Geoghegan") and Robert Efferen ("Efferen"),

Putnam fire inspectors ; Dough Casey ("Casey"), an employee of Putnam's Fire Department; the Town of Carmel ("Carmel"); Daryl Johnson, Chief of the Carmel Fire Department ("Johnson"); Michael Nagle ("Nagle"), a detective in the Carmel Police Department; Robert Behan ("Behan") and John Dearman ("Dearman"), sergeants in the Carmel Police Department; Justin Fischer ("Fischer"), an officer in the Carmel Police Department; Joseph Charbonneau ("Charbonneau"), a Carmel Town Attorney; five John Doe employees of Putnam and Carmel ("Does 1–5"); Anthony F. Porto, Sr. ("Porto, Sr."), and Anthony M. Porto, Jr. ("Porto") (jointly, "the Portos"), owners and operators of Smalley's Inn & Restaurant ("Smalley's Inn" or "the Inn"); and TNT Café, Inc ("TNT"), a corporate entity owned by the Portos and operating Smalley's Inn (collectively, "Defendants").  Plaintiff brings this Action pursuant to 42 U.S.C. § 1983, asserting constitutional violations related to his lengthy imprisonment on false state charges of arson.

Before the Court are three Motions To Dismiss: the first filed by Carmel, Nagle, Behan, Dearman, Fischer, and Charbonneau ("the Carmel Defendants"); the second by Johnson; and the third by Porto (collectively, the "Motions").[1]  For the following reasons, Johnson's and Porto's Motions are denied, and the Carmel Defendants' Motion is denied in large part, but granted with respect to Charbonneau, Behan, Dearman, and Fischer.

## I.  Background

### A.  Factual Background

The following facts, drawn from Plaintiff's Second Amended Complaint ("SAC"), (SAC (Dkt. No. 56)), are assumed to be true for the purposes of resolving the instant Motions.

---

[1] The Court refers to these three Motions as "Carmel Defendants' Motion," "Johnson's Motion," and "Porto's Motion," respectively.

On March 10, 2007, Plaintiff was a patron at Smalley's Inn in Carmel, New York. (*Id.* ¶ 23.) During the late night, an electrical problem created a small fire in the bathroom ceiling. (*Id.* ¶ 24.) Plaintiff and several others smelled smoke, ran into the bathroom and quickly extinguished the fire. (*Id.* ¶ 25.)

Several structural features of the Inn may have contributed to the fire: the physical building dates to the 1800s; the Inn maintained an "antiquated electrical system"; and old newspapers had been stuffed into the walls and ceilings for insulation. (*Id.* ¶¶ 26–27.) Indeed, shortly before the events at issue, the Inn experienced an additional electrical fire caused by the melting away of old wiring. (*Id.* ¶ 27.) Additionally, in the months prior to the events at issue, the New York State Board of Fire Underwriters inspected Smalley's Inn and cited it for "multiple electrical code violations," directing the Inn to "update its electrical system in accordance with the New York State Building and Electrical Code." (*Id.* ¶¶ 28–29.) However, "the P[ortos] failed to make those required updates to the Inn's electrical system." (*Id.* ¶ 30.)

On March 11, 2007, the Portos falsely reported to the Carmel Police Department that Plaintiff "had intentionally set the fire in the bathroom ceiling." (*Id.* ¶¶ 34–35.) At the time of the incident, Plaintiff was renting an apartment from, and on the verge of litigation with, a close friend and business partner of the Portos. (*Id.* ¶ 33.) The Portos were prominent business owners with well-known close ties in the law enforcement community. (*Id.* ¶¶ 32, 41.)

Within hours of the false report, Nagle arrived at the Inn, and the Portos informed him that Plaintiff started the fire. (*Id.* ¶¶ 38–39.) Nagle requested assistance from the Carmel Fire Department and Putnam's Bureau of Emergency Services. (*Id.* ¶ 40.) Johnson, Geoghegan, Efferen, Fischer, Casey, and Does 1–5 responded to the scene. (*Id.* ¶¶ 41–42.) Under New York law and according to local policy, Johnson held legal responsibility to determine how the fire had

started and to designate its cause.  (*Id.* ¶¶ 42–46.)  Nagle informed the responding officials that Plaintiff set the fire and that there were witnesses who told him that Plaintiff "placed paper towels between the drop ceiling and the ceiling and lit the paper on fire."  (*Id.* ¶¶ 47–48.) However, no witness made any such statement.  (*Id.* ¶¶ 35, 49.)

Johnson, Geoghegan, Efferen, and Does 1–5 then concluded that the fire was the product of arson.  (*Id.* ¶ 50.)  In reaching this conclusion, Johnson, Geoghegan, Efferen, and Does 1–5 did not examine several pieces of relevant evidence, including: an electrical device that may have started the fire (which the Portos disposed of prior to their arrival); the entire area above the ceiling of the bathroom; the bathroom vent (despite the statements of two witnesses that flames had emanated from there); the Inn's electrical system (despite the fact that faulty electrical wiring caused another fire several months prior); and the floor above the fire (which sustained the bulk of the damage).  (*Id.* ¶ 51.)  Moreover, the investigation did not account for charred wood (indicating that the fire had been burning for a longer period, and therefore began prior to Plaintiff's entry to the bathroom), and the survival of paper removed from the ceiling (indicating that the paper had been removed from the ceiling as part of an effort to fight the fire, rather than used to start it).  (*Id.*)  Plaintiff infers from these shortcomings that the investigation not only resulted in an incorrect conclusion, but was "invalid, incomplete, reckless, grossly negligent, and intentionally misleading."  (*Id.* ¶ 50.)

Dearman, Fischer, and Nagle arrested Plaintiff for arson.  (*Id.* ¶ 54.)  In connection with this arrest, the Putnam Fire Investigation Team's field notes falsely represented that they had eliminated all electrical systems, appliances, and accidental sources as causes for the fire.  (*Id.* ¶ 56.)  Similarly, Geoghegan and Johnson prepared reports asserting that they "had thoroughly

examin[ed] the physical evidence" and "rul[ed] out all possible accidental and natural causes." (*Id.* ¶¶ 57–58.)

Several Defendants (apparently Geoghegan and Johnson) then submitted these reports to the Putnam County District Attorney's Office ("Putnam D.A."). (*Id.* ¶ 60.) In submitting these reports, these Defendants did not inform the Putnam D.A. about the shortcomings in their investigation or provide exculpatory photographs of the scene. (*Id.* ¶¶ 61–62.) Defendants also did not disclose their close relationship with the Portos. (*Id.* ¶ 63.) Based on these reports and omissions, the Putnam D.A. presented charges against Plaintiff to a grand jury, which then received false testimony from Nagle implicating Plaintiff. (*Id.* ¶¶ 64–65.) The grand jury indicted Plaintiff for arson in the second degree and criminal mischief, and Plaintiff was held pending trial. (*Id.* ¶ 66.) At trial, Geoghegan testified that the fire was not caused "electrically," "accidentally," "mechanically," or "naturally," but was "incendiary in nature." (*Id.* ¶ 68.) On April 16, 2008, Plaintiff was "convicted and sentenced to 10 years in prison." (*Id.* ¶ 69.)

Afterward, the Portos and TNT filed "several knowingly false, inflated[] insurance claims alleging P[laintiff] had started the fire in Smalley's [Inn]" and recovered "substantial sums" based on those claims. (*Id.*) Meanwhile, Plaintiff filed several requests under New York State's Freedom of Information Law ("FOIL") seeking to obtain records establishing his innocence. (*Id.* ¶ 70.) However, Charbonneau "conspired, and aided and abetted . . . in hiding" this "exculpatory and/or impeaching evidence," "hid the requested evidence," and "persuaded a court" to deny Plaintiff's request for the evidence. (*Id.* ¶¶ 71–72.) This conduct delayed Plaintiff's exoneration and release by several years. (*Id.* ¶ 72.)

In 2013, after losing each of his state court appeals, Plaintiff commenced a federal habeas corpus proceeding challenging his conviction before Judge Vincent I. Briccetti ("Judge

Briccetti") in the Southern District of New York. (*Id.* ¶ 73.) Proceeding pro se, Plaintiff submitted two reports from fire experts "who had examined the evidence in P[laintiff's] case and concluded [that] *it was impossible* to conclude that an arson had occurred or to rule out an electrical cause of the fire." (*Id.* ¶¶ 74–75 (emphasis in original).) On May 5, 2016, Putnam County District Attorney Robert Tendy ("Tendy") submitted to Judge Briccetti his view that Plaintiff was "innocent, had been wrongfully convicted, and should be removed from prison immediately." (*Id.* ¶ 76 (emphasis omitted).) Tendy explained that the Putnam D.A. had thoroughly reviewed the case, including Plaintiff's submissions and the report of an additional expert retained by the Putnam D.A., and concluded that Plaintiff had spent years in prison "for helping to put out a fire—not start one." (*Id.* ¶¶ 77–78.) The Putnam D.A. explained that there was "ample evidence that the fire may been electrical," and that video evidence recorded that night "clearly belied many of the assertions made by the prosecution witnesses." (*Id.* ¶¶ 80–82 (citations, quotations marks, and brackets omitted).) The Putnam D.A. also conceded that crime scene photographs that Plaintiff argued were suppressed were, in fact, material and exculpatory. (*Id.* ¶ 83.) The Putnam D.A. consented to Plaintiff's request for relief, and on May 9, 2016, Judge Briccetti ordered Plaintiff's release from prison. (*Id.* ¶¶ 84–85.)

At a May 23, 2016 hearing before Judge Briccetti, the Putnam D.A. agreed on the record that Plaintiff "was actually innocent of the offenses of which he was convicted," that Geoghegan's conclusion that the fire was an arson "was fundamentally flawed," and that "no witness observed [Plaintiff] put anything into the space above the bathroom ceiling tiles." (*Id.* ¶ 86 (citation and quotation marks omitted).) At the conclusion of the hearing, Judge Briccetti granted Plaintiff's habeas petition, vacated his conviction, dismissed his indictment with

prejudice, and permanently enjoined his retrial. (*Id.* ¶ 88 (citation omitted).) At the time of his release, Plaintiff had served "nearly nine years of his 10-year sentence." (*Id.* ¶ 85.)

Plaintiff alleges eight causes of action: (1) evidence manufacturing and denial of a fair trial under the Fifth, Sixth, and Fourteenth Amendments, against all non-municipal Defendants, (*id.* ¶ 90–95); (2) wrongful arrest and detention under the Fourth Amendment and *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911 (2017), against all non-municipal Defendants, (*id.* ¶ 96–100); (3) malicious prosecution and deprivation of liberty under the Fourth, Fifth, Sixth, and Fourteenth Amendments, against all non-municipal Defendants, (*id.* ¶ 101–11); (4) failure to intervene (with respect to Plaintiff's false arrest, detention and prosecution) under the Fourth, Fifth and Fourteenth Amendments, against Behan, Dearman, Johnson, and Does 1-5, (*id.* ¶ 112–17); (5) denial of a fair trial under the Fifth, Sixth, Fourteenth Amendments, and *Brady v. Maryland*, 373 U.S. 83 (1963), against all non-municipal Defendants, (*id.* ¶ 118–26); (6) similar claims as all of the above, under *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978), against Carmel, (*id.* ¶ 127–46); (7) similar claims as all of the above, under *Monell,* against Putnam, (*id.* ¶ 147–62); (8) civil rights conspiracy claims, against all Defendants, (*id.* ¶ 163–68).

Plaintiff seeks damages in connection with his "false arrest and malicious prosecution," his lengthy period of unjust incarceration, his mental and emotional suffering, his "shame and humiliation," his "substantial pain and suffering," and legal fees and various expenses resulting from his arrest, prosecution, and incarceration. (*Id.* ¶¶ 89, 168.)

B.  Procedural Background

Plaintiff filed his initial Complaint on March 30, 2018.  (Compl. (Dkt. No. 1).)  On

December 10, 2018, Plaintiff filed his First Amended Complaint ("FAC").  (FAC (Dkt. No. 55).)

The same day, Plaintiff filed the operative SAC.  (*See generally* SAC.)

On March 19, 2019, the Court set a briefing schedule for Defendants' respective Motions

To Dismiss.  (Dkt. No. 68.)  On April 18, 2019, Johnson filed his Motion To Dismiss and

accompanying papers.  (Not. of Mot. (Dkt. No. 74); Decl. of Peter F. Harrington, Esq.

("Harrington Decl.") (Dkt. No. 75); Def. Johnson's Mem. of Law In Supp. of Mot. ("Def.

Johnson's Mem.") (Dkt. No. 76).)  On May 10, 2019, the Carmel Defendants filed their Motion

To Dismiss and accompanying papers.  (Not. of Mot. (Dkt. No. 78); Carmel Defs.' Mem. of Law

In Supp. of Mot. ("Carmel Defs.' Mem.") (Dkt. No. 79); Decl. of Michael A. Czolacz, Esq.

("Czolacz Decl.") (Dkt. No. 80).)  On July 1, 2019, Plaintiff filed Responses to Johnson's and

the Carmel Defendants' Motions.  (Pl.'s Mem of Law in Opp'n to Def. Johnson's Mot. ("Pl.'s

Mem. Opp'n Johnson") (Dkt. No. 86); Pl.'s Mem of Law in Opp'n to Carmel Defs.' Mot. ("Pl.'s

Mem. Opp'n Carmel") (Dkt. No. 87).)

On July 2, 2019, Porto filed his Motion To Dismiss and accompanying papers.  (Not. of

Mot. (Dkt. No. 88); Decl. of Jennifer A. Casey, Esq. ("Casey Decl.") (Dkt. No. 89); Def. Porto's

Mem. of Law in Supp. of Mot. To Dismiss ("Def. Porto's Mem.") (Dkt. No. 90).)  On July 5,

2019, Plaintiff filed a Response to Porto's Motion.  (Pl.'s Mem of Law in Opp'n to Def. Porto's

Mot. ("Pl.'s Mem. Opp'n Porto") (Dkt. No. 92).)[2]

---

[2] Plaintiff initially filed a response on July 4, 2019, but quickly amended this response
and filed the operative Response the following day.  (*See* Dkt. Nos. 91–92.)

On July 22, 2019, Johnson and the Carmel Defendants filed their Replies, (Def. Johnson's Reply Mem. of Law in Further Supp. of Mot. ("Johnson's Reply") (Dkt. No. 93); Carmel Defs.' Reply Mem. of Law in Further Supp. of Mot. ("Carmel Defs.' Reply") (Dkt. No. 94)), and on July 29, 2019, Porto filed a Reply as well, (Def. Porto's Reply Mem. of Law in Further Supp. of Mot. ("Porto's Reply") (Dkt. No. 95)).

## II. Discussion

### A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering Defendants' Motions, the Court is required to "accept as true all of the factual allegations contained in the [C]omplaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). And, the Court must "draw[] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted).

B.  Analysis

Johnson argues that Plaintiff has failed to adequately allege Johnson's personal involvement in any constitutional violation; that Johnson is entitled to qualified immunity; and that Plaintiff has failed to allege the existence of a conspiracy. (*See generally* Def. Johnson's Mem.) Porto argues that Plaintiff has failed to adequately plead that Porto acted under color of state law or that Porto was directly involved in conduct underlying any of the individual causes of action. (*See generally* Def. Porto's Mem.) The Carmel Defendants argue that Charbonneau's

denial of Plaintiff's FOIL requests do not raise a federal issue; that Charbonneau is, in any case, shielded by qualified immunity; that Plaintiff cannot state a *Monell* claim against Carmel because Johnson had no final decision-making authority with respect to Plaintiff's prosecution; that Plaintiff failed to plead any specific allegations concerning Behan; and that Plaintiff failed to adequately plead a conspiracy claim against the remaining Carmel Defendants. (*See generally* Carmel Defs.' Mem.) The Court considers these arguments only to the extent necessary to resolve the instant Motions.

### 1. Defendant Johnson

#### a. Personal Involvement

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiff] by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (citation and italics omitted). In other words, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Therefore, Plaintiff must plausibly allege that Johnson's actions fall into one of the five categories identified above. *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4

(S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).

"'[D]irect participation' as a basis of liability in this context requires [(1)] intentional participation in the conduct constituting a violation of the victim's rights [(2)] by one who knew of the facts rendering it illegal." *Gronowski v. Spencer*, 424 F.3d 285, 293 (2d Cir. 2005) (first alteration in original) (citation and some quotation marks omitted). Here, despite Johnson's arguments to the contrary, Plaintiff has sufficiently alleged both of these elements. First, Plaintiff specifically alleges that Johnson "was and is the Chief of the Carmel Fire Department," (SAC ¶ 13); that Johnson responded to the scene of the fire pursuant to a request from Nagle, (*id.* ¶ 41); that Johnson "prepared a Carmel Fire Department report" stating that Johnson and two members of a fire investigation team responded to the scene, (*id.* ¶ 58); that the team concluded that "the fire was incendiary in nature," (*id.*); and that Johnson forwarded his report to the Putnam D.A, (*id.* ¶ 60). These allegations suffice to establish that Johnson "participat[ed] in the conduct constituting a violation of the victim's rights." *Gronowski*, 424 F.3d at 293 (citation and quotation marks omitted); *see also Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000) (recognizing a Due Process Clause right "not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity"); *Hincapie v. City of New York*, No. 18-CV-3432, ---F. Supp. 3d---, 2020 WL 362705, at *7 (S.D.N.Y. Jan. 22, 2020) (explaining that officers may be held liable under § 1983 for suppression of exculpatory evidence); *Grega v. Pettengill*, 123 F. Supp. 3d 517, 539–41 (D. Vt. 2015) (finding that an alleged Due Process Clause violation survived a motion to dismiss where the plaintiff pleaded that defendant officers provided misleading evidence to prosecutors).

Second, Plaintiff specifically alleges several facts about the fire investigation that suggest that Johnson's conduct was intentional.  In particular, Plaintiff alleges that basic evidence was not analyzed, (*see* SAC ¶ 51); that Johnson (and other Defendants) did not provide the Putnam D.A. with (or inform him about) exculpatory photographs taken at the scene, (*see id.* ¶ 62); and that several independent experts concluded that the fire investigators' conclusion was not only incorrect, but wholly unsupportable, (*id.* ¶ 75).  Together, these facts are sufficient to raise a plausible inference that Plaintiff "knew of the facts rendering [his conduct] illegal." *Gronowski*, 424 F.3d at 293 (citation and quotation marks omitted); *see also Ying Li v. City of New York*, 246 F. Supp. 3d 578, 623–24 (E.D.N.Y. 2017) (finding that a plaintiff's allegation that defendant officials hid the "absence of any medical support for the charge that [the plaintiff] caused [the victim's] death" was plausible based on allegations suggesting that defendants' conclusions were "entirely unsupportable by any medical science" (record citations, emphases, alteration, and quotation marks omitted)); *McCaffrey v. City of New York*, No. 11-CV-1636, 2013 WL 494025, at *11–13 (S.D.N.Y. Feb. 7, 2013) (explaining that a § 1983 claim arises where "police or prosecutors withhold evidence that is material to [the plaintiff's] guilt or punishment" (citation and quotation marks omitted)).

To the extent that Johnson argues that he, as a Carmel Fire Chief, was not involved in the investigation conducted by the two Putnam fire investigators on the scene, the argument fails. Plaintiff alleges that Johnson himself signed a report stating that he responded to the scene alongside the Putnam fire investigators, and he listed himself as "Officer in Charge."  (SAC, Ex. E (SAC at 58) ("Johnson Incident Report") (Dkt. No. 56).)  Further, Johnson concludes his report by noting that "[t]he team determined the fire was inc[e]ndiary in nature."  (*Id.*)  Thus, not only was Johnson present at the scene, but he appears to have been directly involved in the

investigation.  Additionally, Plaintiff cites to a statement by Robert McMahon, the

Commissioner of the Putnam County Bureau of Emergency Services during the relevant period,

explaining that Putnam fire investigators "simply assist the fire chief in his determination"

regarding the fire.  (SAC ¶ 45 (citing SAC, Ex. A (SAC at 47) ("Commissioner McMahon

Letter") (Dkt. No. 56).)[3]  Plaintiff has, therefore, not simply alleged that Johnson was a

supervisor—but that Johnson was present at the scene and directly involved in the investigation

and reports that Plaintiff alleges were falsified.  *See Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir.

2016) (explaining that, while respondeat superior does not apply to § 1983 claims, supervisors

are liable where they "participated directly in the alleged constitutional violation" (citation

omitted)); *Hincapie*, 2020 WL 362705, at *9 (finding several supervisory officials liable for their

alleged direct involvement in the fabrication and suppression of evidence); *D.K. by L.K. v.*

*Teams*, 260 F. Supp. 3d 334, 360 (S.D.N.Y. 2017) (finding a supervisor liable based on his

alleged personal involvement or his alleged "objectively reckless responses to serious

constitutional violations sufficient to constitute deliberate indifference").  Accordingly, Plaintiff

has adequately alleged Johnson's personal involvement in an underlying constitutional violation.

### b.  Conspiracy

Allegations of a conspiracy to violate civil rights must be pleaded with specificity, and

"[a]n otherwise invalid [§] 1983 claim cannot survive a motion to dismiss merely by mentioning

the word 'conspiracy.'"  *Brewster v. Nassau County*, 349 F. Supp. 2d 540, 547 (E.D.N.Y.

---

[3] While Johnson dismisses McMahon's letter as mere "opinion," (Def. Johnson's Mem. 7), the statement of a local Commissioner of Emergency Services concerning the ordinary course of fire investigations within his jurisdiction appears to be a statement of fact based on personal knowledge.  Indeed, it is likely that McMahon's statements would even be admissible at trial under Federal Rule of Evidence 406 as evidence of an "organization's routine practice." Fed. R. Evid. 406.  Regardless, at the pleading stage, Plaintiff is obligated only to ensure that his allegations are based on a "good faith basis."  Fed. R. Civ. P. 11.

2004); *see also Anilao v. Spota,* 774 F. Supp. 2d 457, 499 (E.D.N.Y. 2011) ("Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed." (citation omitted)).  At the same time, "great leeway should be allowed the pleader, since by the nature of the conspiracy, the details may not be readily known at the time of pleading." *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 458 (S.D.N.Y. 2008) (citation and quotation marks omitted); *see also Medtech Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 795 n.12 (S.D.N.Y. 2008) (discussing "the line of cases . . . that state that courts should give plaintiffs particular leeway in pleading conspiracy" (collecting cases)).  Accordingly, a plaintiff claiming a civil rights conspiracy must allege: "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir. 2002) (citation omitted).

Plaintiff has plausibly alleged each of these elements.  First, Plaintiff has plausibly alleged facts that suggest an agreement between a state actor and a private party.  In particular, Plaintiff alleges specific communications between the Portos (private parties) and Nagle (a state actor) upon Nagle's arrival on the scene, (SAC ¶¶ 38–39), and then between Nagle and Johnson upon Johnson's arrival, (*id.* ¶¶ 47–48.)  Further, Plaintiff alleges that Nagle made false representations about the existence of eyewitnesses, (*id.* ¶ 48), and that Johnson and others then suppressed exculpatory, and developed misleading, evidence, (*id.* ¶¶ 50–62).  Thus, although Plaintiff has not alleged the specific content of the communication between the Portos, Nagle, Johnson and others, Plaintiff has alleged sufficient facts from which the Court can plausibly infer such an agreement.  *See Butler v. Hesch*, 286 F. Supp. 3d 337, 363 (N.D.N.Y. 2018) ("Allegations of direct evidence of conspiracy are not necessary, as conspiracies have long been

recognized to be secretive by nature and often are proven by circumstantial evidence, though detailed allegations of the conspiracy's time and place are helpful to cross the plausibility threshold." (citations omitted)); *see also Maersk,* 554 F. Supp. 2d at 458 (explaining that "great leeway" should be given to a plaintiff alleging details of a conspiracy). Moreover, the fabrication and suppression of evidence clearly amounts to "overt acts" in the service of "inflict[ing] unconstitutional injury," *Ciambriello,* 292 F.3d at 324–25. *See Hincapie*, 2020 WL 362705, at *8 (finding that a constitutional violation was sufficiently pled where the defendant officers allegedly suppressed exculpatory evidence); *Daytree at Cortland Square, Inc. v. Walsh*, 332 F. Supp. 3d 610, 630, 638 (E.D.N.Y. 2018) (finding that the plaintiff stated civil rights conspiracy claim where, inter alia, town officials falsely labeled the plaintiff "a responsible party" in the illegal dumping of toxic materials in an effort to deflect blame); *Grega*, 123 F. Supp. 3d at 540–41 (finding that a constitutional violation was sufficiently pled where the plaintiff alleged that defendant officers provided misleading evidence to prosecutors). Accordingly, because Plaintiff has plausibly alleged all necessary elements of a civil rights conspiracy, these claims survive the instant Motion.

### c. Qualified Immunity

"A government official is entitled to immunity from suit whenever (1) his conduct did not violate clearly established law, or (2) it was objectively reasonable for [the official] to believe that his action did not violate such law. Government officials are thus shielded from liability whenever their actions are based on reasonable mistakes of law or fact." *Naumovski v. Norris*, 934 F.3d 200, 210 (2d Cir. 2019) (alteration in original) (quotation marks and footnotes omitted). With respect to the first prong, Plaintiff has plausibly alleged that Johnson was directly involved in the fabrication and suppression of evidence that led to his unjust loss of liberty. As

the Second Circuit has explained, the right to be free of such conduct has been clearly established for decades. *See Zahrey*, 221 F.3d at 357 (explaining that "the right not to be deprived of liberty as a result of any government officer's fabrication of evidence . . . was clearly established in 1996" (emphasis omitted)).

Nor can Johnson argue, based on the pleadings, that it was "objectively reasonable" for him to believe that he was not violating such a right. After all, Plaintiff points to several startling gaps in Johnson's investigation, (*see* SAC ¶ 51); alleges that that Johnson (and other Defendants) did not provide the Putnam D.A. with exculpatory photographs taken at the scene, (*see id.* ¶ 62); and invokes several expert opinions and the Putnam D.A.'s own findings that the fire investigation—in which Johnson directly participated—was wholly unsupportable, (*id.* ¶ 75). Moreover, the Court has already concluded that such allegations are sufficient to raise a reasonable inference of intentional falsification and suppression of evidence; such conduct, of course, is objectively unreasonable as a matter of law. *See Coggins v. Buonora*, 776 F.3d 108, 114 (2d Cir. 2015) ("[T]he alleged falsification of evidence and the related conspiracy, if true, constitute a violation of clearly established law, and no objectively reasonable public official could have thought otherwise."); *Manganiello v. City of New York*, 612 F.3d 149, 165 (2d Cir. 2010) (denying judgment as a matter of law based on qualified immunity where a jury found that a detective "misrepresented the evidence to the prosecutors, or failed to pass on material information, or made statements that were false, and engaged in such misconduct knowingly"); *Rogers v. Bisono*, No. 15-CV-6670, 2016 WL 4224072, at *5 (S.D.N.Y. Aug. 9, 2016) ("Defendants cannot be protected by qualified immunity since they allegedly fabricated evidence."). Accordingly, because Plaintiff's allegations raise a plausible inference of

objectively unreasonable misconduct violating clearly established law, Johnson cannot invoke qualified immunity at this stage of the proceedings.

### 2. Defendant Porto

#### a. "Under Color of State Law"

"Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law." *Filarsky v. Delia,* 566 U.S. 377, 383 (2012) (citation omitted). Thus, to state a § 1983 claim, a plaintiff must allege (1) that the challenged conduct was "committed by a person acting under color of state law," and (2) that such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell,* 592 F.3d 121, 127 (2d Cir. 2010) (citation and quotation marks omitted). Although the first (i.e., "color-of-state-law") requirement is often fulfilled by defendants who are government officials acting with state power, a plaintiff may also state § 1983 claim against a "private individual defendant" where that individual and a "state official were acting in concert." *Porter-McWilliams v. Anderson*, No. 07-CV-407, 2007 WL 4276801, at *2 (S.D.N.Y Dec. 3, 2007) (citation omitted); *see also Ciambriello*, 292 F.3d at 324 ("A private actor acts under the color of state law when the private actor is a willful participant in joint activity with the State or its agents." (quotation marks omitted) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)).

Here, Plaintiff has plausibly alleged that Porto "acted in concert" with state actors to deprive Plaintiff of his constitutional rights. Indeed, Plaintiff alleges that Porto deliberately concocted the story that Plaintiff started the fire in the Inn, (SAC ¶ 39), and disposed of relevant evidence, (*id.* ¶ 51). Then, at Porto's urging, Nagle and other state actor Defendants fabricated non-existent witnesses and produced unsupportable forensic reports, (*id.* ¶¶ 39, 48–51, 56–58),

and suppressed exculpatory photographic evidence, (*id.* ¶ 62). Plaintiff has, therefore, alleged that Porto actively "conspire[d] with . . . state official[s] to violate . . . [P]laintiff's constitutional rights." *Fisk v. Letterman*, 401 F. Supp. 2d 362, 378 (S.D.N.Y. 2005); *see also Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980) (holding that defendants who conspired with and participated in bribery with federal judge to obtain an injunction and violate the plaintiff's civil rights acted under color of state law); *Young v. Suffolk County*, 705 F. Supp. 2d 183, 198 (E.D.N.Y. 2010) (finding that a private individual acted "under color of state law" where plaintiff alleged that the individual "fabricated evidence, with malicious intent to mislead the police, then called the [c]ounty defendants to the house to search the premises, and then jointly invaded the home with the police in violation of the Fourth Amendment" (citation omitted)), *reconsideration denied*, 2010 WL 11632666 (E.D.N.Y. May 20, 2010); *cf. Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir.1999) (explaining that the mere "provision of background information to a police officer does not by itself make [an individual] a joint participant in state action under [§] 1983" (citations omitted)).[4]

### b. Specific Causes of Action

"The interrelationship between [§] 1983's requirement of personal involvement on the part of the state actor and the availability of a conspiracy theory to support liability for the state

---

[4] In arguing that Plaintiff has failed to adequately plead Porto's involvement in a civil rights conspiracy, Porto invokes *Robbins v. Cloutier*, 121 F. App'x 423, 425 (2d Cir. 2005). The case is wholly inapposite. There, the district court dismissed (and the Second Circuit affirmed the dismissal of) a complaint that consisted entirely of conclusory allegations: that defendants "allegedly acted in a concerted effort," "allegedly agreed to not hire [the] [p]laintiff and to inform other municipalities and private entities to refrain from hiring [the] [p]laintiff," and "ha[d] allegedly done overt acts in order to effectuate their common plan." *Id.* at 425 (quotation marks omitted). These "vague and conclusory allegations" stand in sharp contrast to Plaintiff's factually specific allegations here that Porto told particular lies, hid specific evidence, and spoke with the state actor Defendants—after which they too fabricated and suppressed evidence.

actor is not well explored in the case law." *Pulizotto v. McMahon*, 406 F. Supp. 3d 277, 293 (S.D.N.Y. 2019). On the one hand, actions brought under § 1983 generally require the "defendant's personal involvement in the alleged constitutional deprivation." *Grullon*, 720 F.3d at 138 (citations omitted). However, in the context of criminal conspiracy, it is also well-established that a defendant may be "liable as a conspirator for the[ ] reasonably foreseeable crimes of his coconspirators." *United States v. Joyner*, 201 F.3d 61, 70 (2d Cir. 2000). Several courts have extended this principle to the civil § 1983 context as well. *See Proffitt v. Ridgway*, 279 F.3d 503, 507 (7th Cir. 2002) (explaining in a § 1983 case that "[a]s a conspirator, the citizen is liable, in civil as in criminal law, for the wrongful acts of the other conspirators committed within the scope of the conspiracy" (citations omitted)); *Loughman v. Consol-Pennsylvania Coal Co*., 6 F.3d 88, 103 (3d Cir. 1993) (same, in the context of similar civil conspiracies); *Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983) (same).

Here, the Court need not decide the precise standards under which individual conspirators are held liable for the constitutional violations of their co-conspirators pursuant to § 1983. Regardless of whether the Court applies a "reasonably foreseeable" standard or a "deliberate indifferen[ce]" standard, *see Pulizotto*, 406 F. Supp. 3d at 293 (acknowledging the possible appropriate standards), Plaintiff's factual allegations plausibly establish Porto's involvement. Porto allegedly concocted the accusations against Plaintiff, (SAC ¶¶ 34–35, 39), suppressed relevant evidence, (*id.* ¶ 51), called police to the scene, (¶¶ 34–39), encouraged the police and other officials to falsely implicate Plaintiff, (*id.* ¶¶ 39, 50), and then benefitted financially from Plaintiff's arrest and conviction, (¶ 69). As discussed above, these facts are sufficient to plausibly infer a conspiracy to deprive Plaintiff of his civil rights. More specifically, they suggest that Porto initiated and intended the process that culminated in Plaintiff's conviction, i.e.,

that Porto's co-conspirators would falsify and suppress evidence, wrongfully arrest Plaintiff, prosecute him, and deny him a fair trial. *See Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) ("Although [subsequent] charges were added by the [prosecutor], and thus not directly filed by [the defendant], a jury could find that [the defendant] played a role in initiating the prosecution by preparing the alleged false confession and forwarding it to prosecutors."); *Grega*, 123 F. Supp. 3d at 540 (explaining that a defendant officer who fabricated evidence may be liable for a violation of due process based on the evidence subsequently influencing a jury's decision). In other words, Plaintiff plausibly alleges that the conduct of Porto's co-conspirators was not only "reasonably foreseeable" to Porto, but was actually intentionally triggered by Porto. Such intentional involvement, even if nominally "indirect," is sufficient to state a claim under § 1983. *See Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (explaining that a defendant is liable under § 1983 when "with knowledge of the illegality, [the defendant] participates in bringing about a violation of the victim's rights but does so in a manner that might be said to be 'indirect'—such as ordering or helping others to do the unlawful acts, rather than doing them him—or herself"); *Conte v. County of Nassau*, No. 06-CV-4746, 2008 WL 905879, at *21 (E.D.N.Y. Mar. 31, 2008) (finding that the plaintiff stated a claim under § 1983 against a civilian defendant because an officer "was under the control or influence of" the civilian, even though the civilian was not present for every discrete action taken by the officer), *reconsideration denied*, 2009 WL 393642 (E.D.N.Y. Feb. 13, 2009).

### 3. Defendant Charbonneau

It is well established that the suppression of exculpatory evidence prior to conviction amounts to a constitutional violation actionable under § 1983. *See Walker v. City of New York*, 974 F.2d 293, 300 (2d Cir. 1992) (finding that the plaintiff stated a claim against a district

attorney's office under § 1983 for failing to properly train and supervise its prosecutors in disclosing exculpatory material). It is, however, less clear whether there is a right to disclosure of exculpatory evidence *post-conviction*, and if so, when that right became clearly established. *See Pierre v. City of Rochester*, No. 16-CV-6428, 2018 WL 10072453, at *6–7 (W.D.N.Y. Sept. 7, 2018) (discussing whether such a right exists, and whether it is clearly established), *reconsideration denied*, 2018 WL 5729118 (W.D.N.Y. Nov. 2, 2018), *appeal dismissed*, No. 18-3536 (2d Cir. Jan. 16, 2019). Indeed, several courts—and possibly the Supreme Court—have held that there is no post-conviction constitutional right to exculpatory evidence. *See id.* at *17 ("[T]here is no freestanding substantive due process right to *Brady*-like disclosure post-conviction." (citation omitted)); *Ermichine v. United States*, No. 06-CV-10208, 2011 WL 1842951, at *13 (S.D.N.Y. May 12, 2011) ("The Supreme Court has explained that the prosecutorial duty to disclose exculpatory evidence under Brady is a 'pre[-]conviction trial right' that does not apply post-conviction or to post-conviction proceedings . . . ." (citations omitted)); *see also Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 69 (2009) (explaining that "*Brady* is the wrong framework" for determining whether a state's post-conviction relief procedures satisfy due process).[5] At the same time, the Second Circuit has

---

[5] Crucially, the Supreme Court included several caveats in its *Osborne* decision, all of which distinguish it from the instant case. First, the Supreme Court explained that "a criminal defendant proved guilty after a *fair trial* does not have the same liberty interests as a free man." *Osborne*, 557 U.S. at 68 (emphasis added). This decision, therefore, did not address whether greater protections exist post-conviction for defendants convicted after an *unfair* trial. Second, the Supreme Court discussed only "newly discovered evidence," and therefore did not address long-present exculpatory material that new officials simply *continued* to suppress post-conviction. *Id.* at 64. And third, the Supreme Court emphasized that even post-conviction procedures cannot "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, or transgress[] any recognized principle of fundamental fairness in operation." *Id.* at 69 (citations and quotation marks omitted). Accordingly, the Supreme Court left open the possibility that some post-conviction

recognized that some state-law rights to post-conviction disclosures are subject to the Fourteenth Amendment's procedural protections. *See Newton v. City of New York*, 779 F.3d 140, 151 (2d Cir. 2015) (finding that municipal practices deprived the plaintiff of a state-law right to DNA testing post-conviction).

The Court need not, however, resolve thorny questions about the existence and scope of a constitutional right to post-conviction disclosure of exculpatory evidence for two reasons. First, as a Town Attorney litigating the withholding of such material, Charbonneau is entitled to absolute immunity. *See Warney v. Monroe County*, 587 F.3d 113, 125 (2d Cir. 2009) (holding that a prosecutor is entitled to absolute immunity from civil suit for withholding exculpatory evidence, even post-conviction); *Spear v. Town of W. Hartford*, 954 F.2d 63, 66 (2d Cir. 1992) (recognizing that government attorneys have absolute immunity for their actions "defending civil suits"); *see also Barrett v. United States*, 798 F.2d 565, 572 (2d Cir. 1986) (explaining why absolute immunity applies to government attorneys defending civil suits).[6] Second, Plaintiff has failed to adequately plead that Charbonneau participated in the suppression of evidence—or in any of the alleged constitutional violations—with requisite intent. *See Grullon*, 720 F.3d at 139 (explaining that any theory of liability under § 1983 requires at least "gross[] negligen[ce]"). On the contrary, Plaintiff's only substantive allegation concerning Charbonneau is that he "hid the requested evidence and persuaded a court to deny [Plaintiff] access to [exculpatory] evidence." (SAC ¶ 72.) Plaintiff does not identify what precisely the allegedly exculpatory evidence is,

---

suppressions—perhaps, for example, in cases of clear, actual innocence—may still violate due process.

[6] As the Second Circuit has explained, prosecutors are, of course, "under a continuing ethical obligation to disclose exculpatory information discovered post-conviction." *Warney*, 587 F.3d at 125 (footnote omitted). Moreover, "in extreme cases of intentional suppression, prosecutors may be subject to criminal liability." *Id.* (citation omitted).

state whether Charbonneau ever reviewed that alleged evidence, or provide facts indicating that Charbonneau had no good-faith basis to withhold the evidence in the context of Plaintiff's FOIL requests. Such allegations are inadequate to support the claimed constitutional violation. *See Chrysler v. Guiney*, 14 F. Supp. 3d 418, 450 (S.D.N.Y. 2014) (explaining that *Brady* claims fail where the claimant fails specifically to identify the "potential undisclosed *Brady* materials" (citation and quotation marks omitted)), *aff'd*, 806 F.3d 104 (2d Cir. 2015); *see also O'Neal v. City of New York*, 196 F. Supp. 3d 421, 433 (S.D.N.Y. 2016) (explaining that "conclusory allegations that the government 'suppressed' or 'concealed' evidence are insufficient to plead a *Brady* violation" (alteration and quotation marks omitted)), *aff'd sub nom. O'Neal v. Morales*, 679 F. App'x 16 (2d Cir. 2017). Accordingly, because Charbonneau is entitled to absolute immunity for the relevant claim, and because the SAC does not allege facts supporting his involvement in a constitutional violation, all claims against Charbonneau are dismissed.

### 4. Defendant Carmel

"Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691. Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citation omitted). The fifth element reflects the notion that a *Monell* defendant "may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 403 (1997) (citation omitted); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (holding that a municipality

may not be liable under § 1983 "by application of the doctrine of respondeat superior" (citation and italics omitted)).  Rather, "municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."  *Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008).

A plaintiff may satisfy the "policy, custom[,] or practice" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted); *see also Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 227–28 (2d Cir. 2004) (describing methods of establishing *Monell* liability).  When relying on the second of these theories (i.e., the actions of a policymaker) to establish municipal liability, a plaintiff must allege that the official is a "final policymaker for the local government in a particular area . . . involved in the action." *Jeffes v. Barnes,* 208 F.3d 49, 57 (2d Cir. 2000) (citation and alteration omitted); *see also Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 737 (1989) (explaining that a policymaker must "have the power to make official policy on a particular issue").  In the Second Circuit, an official has final authority "if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions."  *Roe*, 542 F.3d at 38 (2d Cir 2008) (citation and quotation marks omitted).  Accordingly, where a policymaker wholly delegates certain policy powers to a subordinate, the subordinate may herself qualify as a policymaker, thus subjecting the municipality to liability.  *See Stalter v. County of Orange*, No. 15-CV-5274, 2016 WL 8711397,

at \*11 (S.D.N.Y. Aug. 5, 2016) (finding that a plaintiff adequately pleaded that a sheriff had "delegated all final policy-making authority as to disciplinary matters" to an undersheriff, and thereby sufficiently pleaded a *Monell* action based on the undersheriff's conduct (record citation and quotation marks omitted)); *Lathrop v. Onondaga County*, 220 F.Supp.2d 129, 138 (N.D.N.Y 2002) (holding that a Deputy Commissioner of the New York State Division of Criminal Justice Services had final policymaking authority with respect to employment decisions, because the Commissioner left such decisions to the Deputy, spent little time reviewing such matters, and the Deputy understood himself as autonomous). The Second Circuit has further explained that "[w]here a city official has final authority over significant matters involving the exercise of discretion, his choices represent government policy." *Gronowski*, 424 F.3d at 296 (citation and quotation marks omitted).

Here, Plaintiff has adequately alleged that Johnson was a "final policymaker" for the purposes of establishing Carmel's municipal liability. *See Brandon,* 705 F. Supp. 2d at 276–77 (discussing policymaker action as a basis for municipal liability). First, Plaintiff alleges that the four-member Carmel Town Board ("the Board") is the legislative body of the Town of Carmel, (SAC ¶ 133), and that by custom and express provisions in the Town Code the Board assigned final policymaking authority concerning the operations and investigations of the fire department to Johnson, (*id.* ¶¶ 132–137). *See Jeffes*, 208 F.3d at 57 ("Whether the official in question possessed final policymaking authority is a legal question . . . [for which] relevant legal materials[] include state and local positive law, as well as custom or usage having the force of law." (citations, alteration, and quotation marks omitted)); *Soto v. Schembri*, 960 F. Supp. 751, 757 (S.D.N.Y. 1997) ("[I]ndividuals who have policymaking authority can be identified by their receipt of such authority through express legislative grant, or through their delegation of

policymaking authority from those to whom the power has been expressly granted."). Moreover, Plaintiff cites statements by Emergency Services Commissioner McMahon expressly stating that the local policy was (and is) for Johnson to make arson determinations. (SAC ¶¶ 44–46, 130–31.) *See Jeffes*, 208 F.3d at 57 (explaining that courts may look to "a custom or usage having the force of law" in determining whether an official is a policymaker (citation and quotation marks omitted)); *Almonte v. City of Long Beach*, No. 04-CV-4192, 2009 WL 962256, at *5–6 (E.D.N.Y. Mar. 31, 2009) (explaining that determining whether an official is a policymaker may be a "fact-intensive inquiry" that includes examining the actual practices of government officials).[7]

In response, the Carmel Defendants argue that Johnson's policy-making authority "did not cause any deprivation of Plaintiff's constitutional rights" because he had "no final decision-making authority over the decision to prosecute Plaintiff." (Carmel Defs.' Mem. 6–7.) This argument is without merit. As discussed above, Plaintiff has adequately alleged Johnson's participation in the fabrication and suppression of evidence that implicated Plaintiff in arson. Johnson's policy-making authority—which extends to investigations (and determinations) of arson, including the precise event that resulted in Plaintiff's arrest—directly relates to Johnsons' allegedly unconstitutional conduct here. *See Roe*, 542 F.3d at 41 ("An official acts within his

---

[7] New York State law provides that "[t]he fire chief of any fire department shall . . . to the extent reasonably possible determine or cause to be determined the cause of each fire or explosion which the fire department or company has been called to suppress." N.Y. Gen. Mun. Law § 204-d. Plaintiff suggests that this provision conclusively defines Johnson as a policy-maker with respect to arson determinations. (SAC ¶¶ 42–43.) By contrast, Defendants argue that this provision does not apply to the instant case because Johnson and his team were called to investigate, rather than suppress, the fire at the Inn. (Def. Johnson's Mem. 3.) While the Court does not decide whether the provision formally applies to the circumstances at issue here, the Court notes that the existence of the provision lends plausibility to Plaintiff's allegations of a municipal custom assigning responsibility over arson determinations to Johnson.

official policymaking capacity when he acts in accordance with the responsibility delegated him under state law for making policy in that area of the municipality's business." (citation omitted)); *Galgano v. County of Putnam*, No. 16-CV-3572, 2019 WL 2235891, at *4 (S.D.N.Y. May 16, 2019) (finding that a district attorney's policymaking authority over investigations renders the municipality liable under a policymaker theory for evidence fabrication). Moreover, Johnson's policymaking authority need not extend to all the acts of the conspiracy; it is enough that Johnson's policymaking authority actions extended to *some* such acts. *See Amnesty Am. v. Town of West Hartford,* 361 F.3d 113, 127 (2d Cir. 2004) (explaining that "even a single action by a decision maker who possesses final authority to establish municipal policy with respect to the action ordered is sufficient to implicate the municipality" (citation and quotation marks omitted)); *see also Zahrey,* 221 F.3d at 351 (explaining that § 1983 defendants are liable for consequences of "reasonably foreseeable intervening forces" and that an "officer who deliberately supplied misleading information that influenced" later prosecutorial and judicial decisions is liable for those results (citations and quotation marks omitted)).

Accordingly, because Plaintiff has adequately alleged that Johnson (1) is a final policymaker with respect to the investigation and determination of arson, and (2) participated directly in constitutional violations during the course of such an investigation and determination, Plaintiff's *Monell* claim against Carmel survives the instant Motion.[8]

---

[8] Notably, the Carmel Defendants did not argue that Johnson's authority over the fire department and arson determinations are insufficiently discretionary to constitute policymaking. *See Gronowski*, 424 F.3d at 296 (defining "policy" as "significant matters involving the exercise of discretion"). The Court therefore assumes (without prejudice to Defendants arguing the issue at later stages of the case) that such authorities represent policymaking authority, rather than mere "decisions pursuant to [existing] rules." *Gordon v. City of New York*, No. 14-CV-6115, 2018 WL 4681615, at *22 (S.D.N.Y. Sept. 28, 2018) (citation and quotation marks omitted). The Court notes, however, that there is at least some support for Plaintiff's view that Johnson's role defines him as a policy-maker for the purposes of *Monell* liability. *See Mangino v. Inc. Vill.*

### 5. Defendant Behan

"[W]here a plaintiff names a defendant in the caption, but the complaint contains no substantive allegations against the defendant, dismissal of the complaint as to that defendant is appropriate." *Hobbs v. Dep't of Transp. N.Y.C.*, No. 20-CV-512, 2020 WL 1140794, at *3 (S.D.N.Y. Mar. 6, 2020) (citations omitted); *see also Askew v. Lindsey*, No. 15-CV-7496, 2016 WL 4992641, at *7 (S.D.N.Y. Sept. 16, 2016) (same). Here, with respect to Behan, the SAC simply states that he "was and is a [s]ergeant employed by Carmel Police Department." (SAC ¶ 16.) Accordingly, because the SAC does not contain any substantive allegations against him, and on consent of Plaintiff, (*see* Pl.'s Mem Opp'n Carmel 3 n.2), Behan is dismissed from the case.

### 6. Defendants Nagle, Dearman, and Fischer

As the Court noted above, a plaintiff pursuing a civil rights conspiracy claim must allege: "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello*, 292 F.3d at 324–25 (citation omitted). However, "[a]llegations of direct evidence of conspiracy are not necessary, as conspiracies have long been recognized to be secretive by nature and often are proven by circumstantial evidence, though detailed allegations of the conspiracy's time and place are helpful to cross the plausibility threshold." *Butler*, 286 F. Supp. 3d at 363 (citations omitted); *see also Medtech*, 596 F. Supp. 2d at 795 n.12 (discussing "the line

---

*of Patchogue*, 739 F. Supp. 2d 205, 263 (E.D.N.Y. 2010), *on reconsideration in part*, 814 F. Supp. 2d 242, 263 (E.D.N.Y. 2011) (holding that a "chief fire marshal" was a municipal policy-maker based, in part, on his authority to determine "what a proper investigation is and how it is conducted" and "the circumstances under which an inspection should be performed").

of cases . . . that state that courts should give plaintiffs particular leeway in pleading conspiracy" (citations omitted)).

Under these standards, Plaintiff's claims against Nagle survive the instant Motion, but the claims against Dearman and Fischer must be dismissed.  Plaintiff has alleged that Nagle conferred with the Portos upon his arrival at the Inn, (SAC ¶ 38); requested the presence of several other Defendants and conferred with them on the scene, (*id.* ¶¶ 40, 47–48); fabricated the existence of witnesses implicating Plaintiff, (*id.* ¶¶ 48–49); and placed Plaintiff under arrest, (*id.* ¶ 54).  Moreover, Plaintiff has alleged that the Defendants with whom Nagle spoke similarly falsified or suppressed evidence.  (*See id.* ¶¶ 34, 51 (stating the Portos manufactured an accusation against Plaintiff and removed the smoke eater); ¶¶ 51–62 (alleging the preparation of misleading reports and the suppression of photographs by Johnson and his team).)  The allegations of suppression and falsification of evidence clearly qualify as "overt act[s] done in furtherance of" injuring Plaintiff.  *Ciambriello*, 292 F.3d at 324–25 (citation omitted); *see also Daytree*, 332 F. Supp. 3d at 630, 638 (holding that the plaintiff properly alleged a civil rights conspiracy against town and town officials who conspired to implicate the plaintiff as "a responsible party" for their own illegal dumping of toxic materials in a children's park).  Moreover, the combination of these alleged acts with allegations that Nagle and several other Defendants (including private individuals) communicated about the investigation during the very period when these same actors engaged in mutually reinforcing acts to railroad Plaintiff, raises a plausible inference of (1) "an agreement . . . (2) to act in concert" to deprive Plaintiff of his civil rights.  *Ciambriello*, 292 F.3d at 324–25 (citation omitted); *see also Watson v. Grady*, No. 09-CV-3055, 2010 WL 3835047, at *8 (S.D.N.Y. Sept. 30, 2010) (finding a plausible inference of civil rights conspiracy based on allegations that defendants "decided to work" together and made

false statements implicating the plaintiff to prosecutors); *Conte*, 2008 WL 905879, at *19 ("A plaintiff is not required to list the place and date of defendant's meetings and the summary of their conversations when he pleads conspiracy, but the pleadings must present facts tending to show agreement and concerted action." (citation, alterations, and quotation marks omitted)).

By contrast, Plaintiff cannot sustain his claims against Dearman and Fischer. With respect to Fischer, Plaintiff has alleged only that he responded to Nagle's request to come to the Inn. (SAC ¶ 41.) Plaintiff does not, however, allege any facts from which it might be inferred that Fischer had knowledge of, much less participated in, a conspiracy to cause Plaintiff injury. Similarly, Plaintiff's only allegation concerning Dearman is that he participated in Plaintiff's arrest. (*Id.* ¶ 54.) Again, however, Plaintiff does not allege any facts suggesting that Dearman knew or ought to have known that anything was improper about the arrest—much less that he acted in "furtherance of th[e] goal" of causing a deprivation of Plaintiff's rights. *Ciambriello*, 292 F.3d at 325 (citation omitted). Such barebones allegations are "plainly insufficient to state a § 1983 conspiracy claim." *Marshall v. Griffin*, No. 18-CV-6673, 2020 WL 1244367, at *10 (S.D.N.Y. Mar. 16, 2020) (collecting cases); *see also Thomas v. Demeo*, No. 15-CV-9559, 2017 WL 3726759, at *12 (S.D.N.Y. Aug. 28, 2017) (dismissing a § 1983 conspiracy claim because the amended complaint did not "provide even circumstantial allegations that the alleged conspiracy existed, much less any details as to the extent of the alleged agreement or how [the] [d]efendants collectively carried it out" (citation omitted)); *Scalpi v. Town of East Fishkill*, No. 14-CV-2126, 2016 WL 858925, at *5 (S.D.N.Y. Feb. 29, 2016) ("Allegations of a conspiracy to violate civil rights must be pleaded with specificity, and an otherwise invalid § 1983 claim cannot survive a motion to dismiss merely by mentioning the word 'conspiracy[.]'" (citation,

alterations, and quotation marks omitted)).  Accordingly, Plaintiff's conspiracy claims against Dearman and Fischer are dismissed.

### III.  Conclusion

For the foregoing reasons, Porto's and Johnson's Motions are denied in full, and the Carmel Defendants' Motion is denied in part, and granted only with respect to Charbonneau, Behan, Dearman and Fischer.  The denials are without prejudice to Defendants raising arguments related to those discussed here in subsequent stages of the proceedings.

Because this is the first adjudication of Plaintiff's claims, the dismissals are without prejudice.  Plaintiff may file a third amended complaint within 30 days of the date of this Opinion.  The third amended complaint should contain appropriate changes to remedy the deficiencies in this Opinion.  Plaintiff is advised that the third amended complaint will replace, not supplement, the SAC, and therefore must contain *all* of the claims, factual allegations, and exhibits that Plaintiff wishes the Court to consider.  If Plaintiff fails to abide by the 30-day deadline, the dismissals without prejudice may be converted to dismissals with prejudice, and Plaintiff's case will proceed with only the surviving claims.

The Clerk of the Court is respectfully directed to terminate the pending Motions, (Dkt. Nos. 74, 78, 88).

SO ORDERED.

DATED:        March 30, 2020 White
                      Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE