UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RICHARD J. HAUGHEY, *administrator of the Estate of William J. Haughey*,

                                        Plaintiff,

        v.

COUNTY OF PUTNAM, *et al.*,

                                        Defendants.

No. 18-CV-2861 (KMK)

OPINION & ORDER

---

Appearances:

Oscar Michelen, Esq.
Cuomo LLC
Mineola, NY
*Counsel for Plaintiff*

Rita Dave, Esq.
Rita Dave PC
Brooklyn, NY
*Counsel for Plaintiff*

Drew William Sumner, Esq.
Sumner Law LLP
White Plains, NY
*Counsel for Putnam County Defendants*

James Randazzo, Esq.
Portale Randazzo LLP
White Plains, NY
*Counsel for Putnam County Defendants*

Michael Adam Czolacz, Esq.
Kenneth Ethan Pitcoff, Esq.
Cristina Soller, Esq.
Morris Duffy Alonso & Faley
New York, NY
*Counsel for Carmel County Defendants*

John Diaconis, Esq.
Peter Francis Harrison, Esq.
Bleakley Platt & Schmidt LLP
White Plains, NY
*Counsel for Defendant Daryl Johnson*

Jennifer Anne Casey, Esq.
Casey Law Group, PLLC
Bellmore, NY
*Counsel for Defendant Anthony M. Porto*

KENNETH M. KARAS, District Judge:

Richard J. Haughey "(Plaintiff), administrator of the Estate of William J. Haughey

("Decedent"), brings this Action against Defendants the County of Putnam ("Putnam"); Robert

Geoghegan ("Geoghegan") and Robert Efferen ("Efferen"), Putnam fire investigators; Dough

Casey ("Casey"), an employee of Putnam's Fire Department; the Town of Carmel ("Carmel");

Daryl Johnson, Chief of the Carmel Fire Department ("Johnson"); Michael Nagle ("Nagle"), a

detective in the Carmel Police Department; Robert Behan ("Behan") and John Dearman

("Dearman"), sergeants in the Carmel Police Department; Justin Fischer ("Fischer"), an officer

in the Carmel Police Department; Joseph Charbonneau ("Charbonneau"), a Carmel Town

Attorney; five John Doe employees of Putnam and Carmel ("Does 1–5"); Anthony F. Porto, Sr.

("Porto, Sr."), and Anthony M. Porto, Jr. ("Porto") (jointly, "the Portos"), owners and operators

of Smalley's Inn & Restaurant ("Smalley's Inn," "Smalley's," or "the Inn"); and TNT Café, Inc

("TNT"), a corporate entity owned by the Portos and operating Smalley's (collectively,

"Defendants").  Plaintiff brings this Action pursuant to 42 U.S.C. § 1983, asserting constitutional

violations related to Decedent's lengthy imprisonment on false state charges of arson.[1]  (*See*

*generally* Second. Am. Compl. ("SAC") (Dkt. No. 56).)

---

[1]  In an Opinion and Order dated March 30, 2020, the Court dismissed Defendants
Charbonneau, Behan, Dearman, and Fischer.  (*See* Op. & Order ("MTD Op.") 2 (Dkt. No. 97).)

Before the Court are three Motions for Summary Judgment: the first was filed by Putnam, Casey, Efferen, and Geoghegan (the "Putnam Defendants"); the second by Johnson; the third by Carmel and Nagle (the "Carmel Defendants") (collectively, the "Motions").  (*See* Dkt. Nos. 153, 156, 159.)[2]  For the following reasons, the Motions are denied in part and granted in part.

## I.  Background

### A.  Factual Background

The following facts are taken from the Putnam Defendants' Statement pursuant to Local Rule 56.1, (Putnam's Defs.' Rule 56.1 Statement in Supp. of Mot. for Summ. J ("Putnam Defs.' 56.1") (Dkt. No. 155)), Johnson's Statement pursuant to Local Rule 56.1, (Johnson's Rule 56.1 Statement in Supp. of Mot. for Summ. J ("Johnson's' 56.1") (Dkt. No. 158)), Carmel Defendants' Statement pursuant to Local Rule 56.1, (Carmel Defs.' Rule 56.1 Statement in Supp. of Mot. for Summ. J ("Carmel Defs.' 56.1") (Dkt. No. 165)), Plaintiff's Counter Statements pursuant to Local Rule 56.1, (Pl.'s Counter Rule 56.1 Statement in Opp'n to Mot. for Summ. J ("Pl.'s Counter 56.1 – Putnam Defs.") (Dkt. No. 170); Pl.'s Counter Rule 56.1 Statement in Opp'n to Mot. for Summ. J ("Pl.'s Counter 56.1 – Carmel Defs.") (Dkt. No. 173); Pl.'s Counter Rule 56.1 Statement in Opp'n to Mot. for Summ. J ("Pl.'s Counter 56.1 – Johnson") (Dkt. No. 176)), and Putnam's Counter Statement Pursuant to Local Rule 56.1 (Putnam Defs.' Counter

---

[2] The Carmel Defendants' Notice of Motion states that their Motion for Summary Judgment was brought by Carmel, Fischer, Dearman, and Nagle.  (*See* Not. of Mot. (Dkt. No. 159).)  However, because Fischer and Dearman were dismissed as Defendants by this Court's Opinion & Order dated March 30, 2020, (*see* MTD Op. 2), the Court will consider the Carmel Defendants' Motion as being brought solely by Carmel and Nagle.  The Court will similarly decline to address any arguments in the Carmel Defendants' papers regarding whether Fischer and Dearman are entitled to summary judgment, given that they are already dismissed from the Action.

Rule 56.1 in Supp. of Mot. for Summ. J ("Putnam Defs.' Counter 56.1") (Dkt. No. 184)).  The

facts are recounted "in the light most favorable" to Plaintiff, the non-movant on the claims

subject to Federal Rule of Civil Procedure 56.  *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d

Cir. 2021).

In the early hours of the morning on March 10, 2007, there was a small fire in the men's

bathroom at Smalley's Inn in Carmel, New York, which was owned at the time by Porto.

(Johnson's 56.1 ¶ 1; Carmel Defs.' 56.1 ¶ 1; Putnam Defs.' ¶ 1.)[3]  Decedent and Porto were both

present at Smalley's at the time of the fire.  (Johnson's 56.1 ¶¶ 2–3.)  Decedent used the men's

bathroom twice prior to the discovery of the fire.  (Putnam Defs.' 56.1 ¶¶ 17, 22.)  When the fire

was discovered, Decedent, along with other patrons and staff, helped extinguish the fire.

(Johnson's 56.1 ¶ 4.)  After the fire was extinguished, there was a confrontation between Porto

and Decedent, during which Porto accused Decedent of setting the fire.  (Johnson's 56.1 ¶ 5; *see*

*also* Putnam Defs.' 56.1 ¶ 52.)[4]  After the confrontation, Decedent left Smalley's and drove to

---

[3] Plaintiff alleges that Smalley's was "housed in a 155-year-old building with an outdated and deteriorating electrical system."  (Pl.'s Counter 56.1 – Putnam Defs. ¶ 267.)   Plaintiff further alleges the following facts: "prior owners of the Inn had stuffed old newspapers into Smalley's walls and ceilings as insulation"; "[a]t the [] time of the fire, the Inn had no smoke alarms or sprinklers, . . . and permitted patrons to smoke"; "[a]bout three months before the March 2007 fire, in December 2006, fire fighters responded to a fire caused by old wiring that had melted and was connected to a chandelier"; and "just two months before the March 2007 fire, [Porto] settled a lawsuit he brought against the Smalley family, claiming Smalley's antiquated electrical system caused him to be electrocuted."  (*Id.* ¶¶ 268–271.)  Defendants dispute these allegations.  (*See e.g.*, Putnam Defs.' Counter 56.1 ¶¶ 267–272.)

[4] According to the Carmel Defendants, Porto "was friends with [Decedent's] former landlord Lou Albano, who had made a criminal complaint against Plaintiff that led to his arrest earlier in the year."  (Carmel Defs.' 56.1 ¶ 9.)  Further, "[u]pon seeing [Decedent] for the first time that night, Porto told Plaintiff that he had 'some nerve' showing his face at Smalley's, called [Decedent] a 'piece of shit,' and told him never to show his face at Smalley's again."  (*Id.* ¶ 10.)  Plaintiff does not dispute these facts.  (Pl.'s Counter 56.1 – Carmel Defs. ¶¶ 9–10.)

McCarthy's, a bar located a couple miles away from Smalley's, and Porto called the Carmel Police Department.  (Johnson's 56.1 ¶ 6; Putnam Defs.' 56.1 ¶¶ 52, 57.)

Nagle, a Detective in the Carmel Police Department, responded to the call.  (Johnson's 56.1 ¶ 8.)  When Nagle arrived at Smalley's, several officers from the Carmel Police Department were already there.  (*Id.* ¶ 9.)  Nagle inspected the bathroom where the fire occurred, took photographs, and interviewed witnesses.  (*Id.* ¶¶ 12–14.)  In the bathroom, Nagle observed charred debris on the floor and in a urinal.  (Carmel Defs.' 56.1 ¶ 3.)  He also noticed that a ceiling tile had been removed, revealing charring on the wood in the ceiling subspace.  (*Id.*)  Multiple witnesses informed Nagle that Decedent was the last person to use the men's room prior to the discovery of the fire and that they observed Decedent borrow a cigarette lighter shortly before the fire was discovered.  (*Id.* ¶¶ 8, 11.)

Meanwhile, Town of Kent Police Offer Gerald Ranieri ("Ranieri") approached Decedent on the back porch of McCarthy's and asked Decedent if he would accompany him to Smalley's so that he could speak with members of the Carmel Police Department.  (Putnam Defs.' 56.1 ¶ 60.)  Decedent voluntarily agreed and entered the back seat of Ranieri's patrol car.  (*Id.* ¶¶ 62–64.)  Once at Smalley's, Nagle introduced himself to Decedent and asked if Decedent would accompany him to the Carmel police station.  (*Id.* ¶ 80.)  Decedent agreed.  (*Id.* ¶ 81.)  At the station, Decedent spoke to Nagle in one of the interview rooms.  (*Id.* ¶¶ 85, 88.)  When asked about the fire, Decedent stated that he did not do anything wrong, and he requested to leave. (Carmel Defs.' 56.1 ¶ 21.)  A different police officer drove Decedent back to his car, which was parked at McCarthy's, and from there, Decedent drove home.  (Putnam Defs.' 56.1 ¶¶ 91–92.)

The next morning, Nagle returned to Smalley's.  (Carmel Defs.' 56.1 ¶ 24.)  Also present later that day were Putnam County Fire Investigators Geoghan and Efferen (the "Fire

Investigation Team"), Johnson, the Chief of the Carmel Fire Department, and Casey, a liaison

between the Putnam County Bureau of Emergency Services and the Fire Investigation Team.

(Putnam Defs.' 56.1 ¶¶ 97–104.)  Some time later, Geoghegan prepared a report summarizing

the Fire Investigation Team's findings (the "Report").  (Johnson's 56.1 ¶ 27.)  The Report

included photographs taken by Geoghegan and Efferen, diagrams they made of the fire location,

and a narrative summarizing their investigation.  (*Id.* ¶ 29.)  The narrative portion of the Report

states, in relevant part:

> The Fire Investigation Team arrived on scene at 1405 hours.  CPD Detective
> Michael Nagle and CFD Chief Daryl Johnson arrived on scene a few moments later.
> Detective Nagle informed F.I.T. members present and Chief Johnson that at
> approximately 0100 hours on 03-10-07 a male had allegedly tried to set a fire in the
> Men's Room at Smalley's [I]nn.  Detective Nagle requested that the F.I.T. examine
> the men's room and determine the cause of the fire; whether it was accidental,
> natural, or incendiary in nature.  Detective Nagle informed the team that he had
> statements from witnesses present at the time of the incident that a male had placed
> paper towels in between the drop ceiling and lit the paper.  Witnesses stated that
> the male then sat at the bar and as the fire grew in size, smoke started to enter the
> bar area.  The male, identified as Mr. William Haughey, then entered the bathroom
> and removed a drop ceiling tile and pulled out the burning paper towels with his
> bare hands.

(Carmel Defs.' 56.1 ¶ 26.)  The Fire Investigation Team "determined that the fire was incendiary

in nature because there was no electrical wiring, electrical outlets, electrical appliances, heating

units, or pipes in the vicinity of the fire."  (*Id.* ¶ 27.)  Plaintiff disputes the Report's conclusion,

stating that it "was impossible for [the Fire Investigation Team] to legitimately make [the]

conclusion" that the fire was incendiary in nature.  (Pl.'s Counter 56.1 – Carmel Defs. ¶ 226.)

On March 11, 2007, Sergeant Dearman and Officer Fischer of the Carmel Police

Department arrested Decedent while he was at the Knights of Columbus bar.  (Putnam Defs.'

56.1 ¶¶ 141, 149.)  Decedent was charged with two felonies: criminal mischief in the third

degree, as well as arson in the second degree.  (*Id.* ¶ 154.)  After Decedent was arraigned, he was

transported to the Putnam County Correctional Facility.  (*Id.* ¶ 155.)  Decedent's criminal trial was held in February 2008.  (*Id.* ¶ 191.)  After a week-long trial, a jury convicted Decedent of arson on February 15, 2008.  (*Id.* ¶ 212.)  In April 2008, Decedent was sentenced to ten years of imprisonment and five years of post-release supervision.  (*Id.* ¶ 214.)

On December 6, 2013, while Decedent was incarcerated, he filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of New York (the "Petition").  (*See* Pet., *Haughey v. Gonyea*, No. 13-CV-8768 (Dkt. No. 2).)  On May 5, 2016, nearly nine years after Decedent's conviction, Putnam County District Attorney Robert Tendy ("Tendy") filed a memorandum of law in the *Haughey v. Gonyea* case joining in Decedent's Petition.  (*See* Mem. of Law in Supp. of Pet., *Haughey v. Gonyea*, No. 13-CV-8768 (Dkt. No. 94).)  The memorandum stated that "the evidence adduced at trial was legally insufficient" and that Decedent "has made a clear and convincing showing that he is actually innocent." (*Id.* at 6; *see also* Pl.'s Counter 56.1 – Putnam Defs. ¶ 355.)  On May 23, 2016, Judge Vincent L. Briccetti granted the Petition, thereby vacating Decedent's conviction, sentence, and the underlying indictment with prejudice and unconditionally releasing Decedent.  (*See* Judg., *Haughey v. Gonyea*, No. 13-CV-8768 (Dkt. No. 97); *see also* Pl.'s Counter 56.1 – Putnam Defs. ¶ 369.)

B.  Procedural History

Because the procedural background of this Action has been summarized in this Court's previous Opinion & Order on Defendants' Motions To Dismiss the SAC (the "MTD Opinion"), the Court assumes familiarity therewith and supplements the procedural history since the issuance of that opinion.  (*See* MTD Op. 8–9.)  On March 30, 2020, the Court denied Porto's and Johnson's Motions to Dismiss and denied the Carmel Defendants' Motion to Dismiss in large

part, except that the Court dismissed Defendants Charbonneau, Behan, Dearman, and Fischer from the Action.  (*See id.* at 32.)

On November 18, 2020, the Court adopted a Case Management Plan and Scheduling Order.  (Dkt. No. 103.)  On March 17, 2021, the Court granted Plaintiff's second request for an extension of time to complete fact discovery after initially denying Plaintiff's first request.  (Dkt. No. 115.)  On June 1, 2021, the Court granted Plaintiff's third request to extend the fact discovery deadline.  (Dkt. No. 123.)  On August 16, 2021, the Court granted the Carmel Defendant's request to extend the fact discovery deadline.  (Dkt. No. 133.)

Meanwhile, on March 24, 2021, the Putnam Defendants filed an Answer to the SAC. (Dkt. No. 117.)  Johnson filed an Answer to the SAC on July 27, 2021.  (Dkt. No. 130.)

On December 6, 2021, the Court set a briefing schedule for Defendants' anticipated Motions for Summary Judgment.  (Dkt. No. 149.)  On January 18, 2022, the Court granted the Carmel Defendants' request to extend their time to file their anticipated Motion.  (Dkt. No. 151.)

On February 8, 2022, the Putnam Defendants filed their Motion for Summary Judgment and accompanying papers.  (Dkt. Nos. 153–155, 160.)  On the same day, Johnson filed his Motion for Summary Judgment and accompanying papers.  (Dkt. Nos. 156–158, 162, 164.)  The Carmel Defendants also filed their Motion for Summary Judgment and accompanying papers on February 8, 2022.  (Dkt. Nos. 159, 161, 163, 165.)  On May 9, 2022, Plaintiff filed his Opposition and accompanying papers.  (Dkt. Nos. 168–176.)  On June 10, 2022, after receiving an extension, (Dkt. No. 179), Defendants filed their Replies and accompanying papers.  (Dkt. Nos. 180–185.)

Meanwhile, on May 19, 2022, due to the passing of Decedent, the Court granted Plaintiff's request to replace Decedent as Plaintiff.  (Dkt. No. 179.)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cnty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same); *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

 "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012)

(emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge

. . . .”); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding “statements not based on [the] [p]laintiff’s personal knowledge”); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) (“The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge.” (quotation marks omitted)).

As a general rule, “district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage.” *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (noting that at the summary judgment stage, the court is not to “weigh the evidence and determine the truth of the matter”); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) (“Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.” (citation omitted)).  Where the evidence presents “a question of ‘he said, she said,’” the court “cannot . . . take a side at the summary judgment stage.” *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that “it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash”); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that “[w]here each side ... tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court”).  And, even if the non-movant's evidence is “thin, [a non-movant's] own sworn statement is adequate to counter summary judgment*.” Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that “[t]he credibility of [Plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact”).

B. Analysis

    1.  False Arrest

The statute of limitations for false arrest claims filed in New York under § 1983 is three years.  *See Rivera v. City of New York*, No. 20-CV-9968, 2022 WL 1523165, at *4 (S.D.N.Y. May 13, 2022).  "Although § 1983 claims accrue when the plaintiff knows or has reason to know of the harm . . . there remains some inconsistency in Second Circuit authority as to exactly when a false arrest claim accrues."  *Bynum v. Doe*, No. 16-CV-6332, 2019 WL 1259568, at *3 (E.D.N.Y. Mar. 19, 2019) (first citing *Connolly v. McCall*, 254 F.3d 36, 41 (2d Cir. 2001); and then citing *Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980)); *see also id.* (determining that the plaintiff's false arrest claim accrued on the date of his arraignment, and not the date of his arrest).  Whether Plaintiff's false arrest claim accrued on the date of his arrest or the date of Decedent's arraignment—both of which occurred on March 11, 2007—Plaintiff does not dispute that his false arrest claim is timed barred.  (*See* Pl.'s Counter 56.1 – Putnam Defs.' ¶ 222.)  Plaintiff also fails to address this claim in his Oppositions to each of the Motions.  (*See generally* Pl.'s Mem. of Law in Opp'n to Putnam Defs.' Mot. ("Pl.'s Opp'n – Putnam Defs.") (Dkt. No. 169); Pl.'s Mem. of Law in Opp'n to Carmel Defs.' Mot. ("Pl.'s Opp'n – Carmel Defs.") (Dkt. No. 172); Pl.'s Mem. of Law in Opp'n to Johnson's Mot. ("Pl.'s Opp'n – Johnson.") (Dkt. No. 175)).  This claim is therefore deemed abandoned and dismissed from the Action.  *See Fujian Ocean Shipping Co. v. O.W. Bunker Far E. (S) PTE. LTD.*, No. 16-CV-401, 2022 WL 902668, at *6 (S.D.N.Y. Mar. 28, 2022) ("[F]ederal courts have found that a [party] abandons their claim when they fail to address it in their opposition papers to summary judgment." (second alteration in original) (citation omitted)); *Ragland v. City of New York*, No. 20-CV-3556, 2022 WL 580923, at *7 (S.D.N.Y. Feb. 25, 2022) ("Federal courts may deem a

claim abandoned when a party moves for summary judgment on one ground and the party

opposing summary judgment fails to address the argument in any way."); *Cooper v. City of New*

*Rochelle*, 925 F. Supp. 2d 588, 600–01 (S.D.N.Y. 2013) ("[The] [p]laintiffs have failed to

oppose [the] [d]efendants' motion [for certain claims]. . . .  Therefore, [the] [p]aintiffs are

deemed to have abandoned such claims, and they are hereby dismissed.").

    2.  Fair Trial

      a.  Fabricating Evidence

    "To prove a [§] 1983 fair trial claim, a plaintiff must establish that (1) the officer created

false information, (2) the officer forwarded the false information to prosecutors, (3) the false

information was likely to influence a jury's decision, and (4) the plaintiff suffered a deprivation

of life, liberty, or property as a result of the officer's actions."  *Kee v. City of New York*, 12 F.4th

150, 168 (2d Cir. 2021) (citation omitted); *see also Bellamy v. City of New York*, 914 F.3d 727,

745 (2d Cir. 2019) ("When a police officer creates false information likely to influence a jury's

decision and forwards that information to prosecutors, he violates the accused's constitutional

right to a fair trial." (citation omitted)).  "[A §] 1983 fair trial claim is available to a defendant

even if the underlying criminal charges are dismissed and the fabricated evidence is never

presented at trial."  *Kee*, 12 F. 4th at 168 (citing *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 249–

50 (2d Cir. 2020)).  Indeed, "a [§] 1983 claim for the denial of a right to a fair trial based on an

officer's provision of false information to prosecutors can stand even if the officer had probable

cause to arrest the [§] 1983 plaintiff," meaning that "fair trial claims cover kinds of police

misconduct not addressed by false arrest or malicious prosecution claims."  *Garnett v.*

*Undercover Officer C0039*, 838 F.3d 265, 277–78 (2d Cir. 2016).  "Where the plaintiff asserts a

[§] 1983 fair-trial claim based on fabricated evidence, all that is required is that the underlying

criminal proceeding be terminated in such a manner that the lawsuit does not impugn an ongoing prosecution or outstanding conviction." *Smalls v. Collins*, 10 F. 4th 117, 139 (2d Cir. 2021) (emphasis omitted).

Plaintiff argues that Defendants "deceived the District Attorney's Office into bringing arson charges against [Haughey] by submitting false reports and making a host of misrepresentations misleading the District Attorney, including (1) all possible electrical causes for the fire had been eliminated and thus the fire was incendiary, (2) the failure to secure the fire scene for 13-hours, and leaving it under Porto's control, did not have any impact on the ability to determine that the fire was incendiary, and (3) several eyewitnesses observed Haughey start the fire and then return to sit down at the bar." (Pl.'s Opp'n – Putnam Defs. 4–5; *see also* Pl.'s Opp'n – Carmel Defs. 4–6; Pl.'s Opp'n – Johnson 4–9.) In support of this argument, Plaintiff submits the expert report of William E. Tulipane ("Tulipane"), a retired Fire Marshal and expert in fire suppression and investigation with over 40 years of experience. (*See* Pl.'s Opp'n – Carmel Defs. Ex. I.1 ("Tulipane Expert Report") 7–8 (Dkt. No. 172-16).)[5] Tulipane stated that, after reviewing the case materials, he determined that "several serious mistakes were made that are responsible for the declaration that this fire was incendiary." (*Id.* at 11.) According to Tulipane, the first mistake was that "there was no response by the Carmel Fire Department or any other Fire Department at the time of the incident. The establishment should have been vacated and secured to ensure an investigation that would not be compromised. . . . The fire investigator however arrived some 13 hours after the fire." (*Id.* (emphasis omitted).) Tulipane also pointed out several other mistakes made by the fire investigators. For example, Tulipane

---

[5] When citing to the Tulipane Expert Report, the Court refers to the ECF-stamped page numbers in the top right corner of each page.

stated that the Fire Investigation Team failed to: "examine the fire damage where the smoke eater was located"; "document with photos the damage to the floor above the dropped ceiling, not only from below but from the [second] floor room directly above"; "examine the circuit the smoke eater was connected to"; "locate and inspect the electrical panel"; and to "take measurements" (*Id.* at 13–14.)  Tulipane also stated that "testimony indicates that Detective Nagel informed the assigned fire investigator Robert Geoghegan who arrived 13 hours after the occurrence, that someone had started the fire, lending prejudice to the investigation." (*Id.* at 12.) Tulipane concluded, "It is therefore my opinion having investigated thousands of fires and having years of training in the related field of fire investigation that the cause of this fire could not be ascertained with any degree of scientific certainty . . . ." (*Id.* at 15.)  Plaintiff argues that a notation in the Fire Inspection Team's paperwork corroborates Tulipane's conclusion that the Fire Inspection Team's inspection was insufficient.  (*See* Pl.'s Opp'n – Putnam Defs. 6.) Specifically, there is a notation indicating that the team failed to inspect the electrical panel.  (*See id.*)  It reads, "Tripped / Blown: Panel Not Inspected." (Pl.'s Opp'n – Carmel Defs. Ex. P ("Fire Investigation Team Notes") (Dkt. No. 172-21).)

Defendants, on the other hand, contend that the "conclusion that the fire cause and origin was incendiary in nature was not false or fabricated." (Putnam Defs.' Mem. 6; *see also* Carmel Defs.' Mem. 17–19.)  In support of their position, Defendants submit the expert report of Thomas D. Schneiders ("Schneiders"), who served in the Philadelphia Fire Department for 24 years and has been serving as a fire expert in the private sector since his retirement in 1996. (*See* Decl. of Kenneth E. Pitcoff, Esq. in Supp. of Carmel Defs.' Mot. for Summ. J. ("Pitcoff Decl.")

Ex. M ("Schneiders Expert Report") 5 (Dkt. No. 161-17).[6]  After reviewing the record and conducting a site visit to Smalley's on October 6, 2021, Schneiders concluded that the "fire was intentionally started by the application and holding of an open flame device, i.e., matches lighter, etc., to the paper products present in the first-floor men's room above the drop ceiling." (*Id.* at 8.)  Schneiders further stated that he was "in agreement with the opinions of Putnam County Fire Investigator Robert Efferen and Investigator Robert Geoghegan.  Due to this minor fire, they were competent in their evaluation of all sides of the fire, i.e., the fire's limited outward spread, the fire's early detection and successful early extinguishment." (*Id.* at 7.)

"[S]ummary judgment is inappropriate when there is a battle of the experts."  *Knight v. New York State Dep't of Corr.*, No. 18-CV-7172, 2022 WL 1004186, at *12 (S.D.N.Y. Mar. 30, 2022); *see also Rouse v. Vanier*, No. 19-CV-06862, 2021 WL 5544935, at *5 (W.D.N.Y. Nov. 27, 2021) ("The conflicting expert opinions before the [c]ourt on the instant motion demonstrate the existence of genuine issues of material fact, making summary judgment inappropriate."); *Smith v. City of New York*, No. 12-CV-4922, 2015 WL 4643125, at *5 n.6 (S.D.N.Y. Aug. 5, 2015) ("We cannot resolve this 'battle of the experts' at summary judgment."); *Realtime Data, LLC v. Stanley*, 897 F. Supp. 2d 146, 153 (S.D.N.Y. 2012) ("[W]hen there are dueling experts, both of whom have put forward opinions in contradiction with each other, and when those opinions are important to resolution of a material factual dispute, summary judgment may not be appropriate."); *In re Refco Inc. Sec. Litig.*, No. 07-CV-8663, 2011 WL 13243784, at *16 n.21 (S.D.N.Y. Mar. 28, 2011) (declining to grant summary judgment because of a battle of the experts).

---

[6] When citing to the Schneiders Expert Report, the Court refers to the ECF-stamped page numbers in the top right corner of each page.

Moreover, Decedent stated at his deposition that he was falsely accused of starting the fire.  (*See e.g.*, Decl. James A. Randazzo, Esq. in in Supp. of Putnam Defs.' Mot. ("Randazzo Decl.") Ex. B ("Pl. Dep. Tr.") 458 (Dkt. No. 160-36).)  "[P]laintiff's testimony is sufficient to create a disputed fact as to" whether he started the fire.  *Carrillos v. Inc. Vill. of Hempstead*, 87 F. Supp. 3d 357, 378 (E.D.N.Y. 2015); *see also Bellamy*, 914 F.3d at 746 ("[A] § 1983 plaintiff's testimony alone may be independently sufficient to raise a genuine issue of material fact."); *Marom v. Blanco*, No. 15-CV-2017, 2019 WL 3338141, at *9 (S.D.N.Y. July 25, 2019) (denying summary judgment on fair trial claim where the defendant and plaintiff gave conflicting testimony because "[t]his testimony creates a triable issue with respect to the element of fabrication" (citing *Bellamy*, 914 F.3d at 746)).

Plaintiff additionally presents evidence creating a genuine dispute of material fact as to whether Defendants knowingly misled the prosecutors into thinking that Decedent started the fire.  First, ADA Robert Noah ("Noah") stated in his deposition that he relied on the Fire Investigation Team's conclusion that the fire was not electrical:

> Q:      [D]id you rely on the fire team's conclusion that there was no electrical cause for the fire?
>
> A:      I'm sure we relied on their conclusions and Mr. Porto's testimony that there was no electricity up there.

(Pl.'s Opp'n – Putnam Defs. Ex. A ("Noah Dep. Tr.") 101:7–12 (Dkt. No. 169-1).)  Given that the Fire Investigation Team's notes indicate that they did not inspect the electrical panel, Plaintiff has created the inference that Defendants knowingly misled the prosecutors into believing that the fire could not have been electrical.

Second, Geoghegan stated in his deposition that when he first arrived at Smalley's he expressed concern that the scene had been unsecured for 13 hours:

> Q:     What did you say, to your recollection, to Mr. Nagle when he gave you that information [about what had occurred]?
>
> A:     I said, well, it's been 13 hours-plus since this happened.  I said the scene hasn't been protected.  So if it's a crime scene, it's—you know, it's questionable because no one secured the scene for over 13 hours.

(Pl.'s Opp'n – Carmel Defs. Ex. D ("Geoghegan Dep. Tr.") 28:18–24 (Dkt. No. 172-7).)

Geoghegan further stated that he had never been called to a scene that had been unsecured for that long.  (*See id.* at 65:1–6.)  However, none of these concerns is reflected in the Fire Investigation Team's Report, on which, as established, the prosecutors relied.  (*See generally* Pl's Opp'n – Putnam Defs. Ex. N ("Fire Investigation Team Report") (Dkt. No. 169-19).)  What the Report *does* state, however, is that "Detective Nagle informed the Team that he had statements from witnesses present at the time of the incident that a male had placed paper towels in between the drop ceiling and lit the paper."  (*Id.* at 1.)  However, during his deposition, Nagle stated:

> Q:     Had you informed the fire investigative team that you had in your possession, statements from witnesses present that a male had placed towels in between the drop ceiling and the ceiling and lit the paper?
>
> A:     I did not have statements that said that.
>
> . . .
>
> Q:     Now, you indicated that you did not have witness statements—you indicated that you had not—you did not possess any witness's statements staying [sic] that a male had placed paper towers in between the dropped ceiling; correct?
>
> A:     No one saw that, no.
>
> Q:     So where do you think that they got this information from?
>
> . . .
>
> A:     I don't know.

(Pl.'s Opp'n – Putnam Defs.' Ex. F ("Nagle Dep. Tr. 2"), at 95:21–96:2, 98:2–13 (Dkt. No. 169-11).)  This creates the inference that either: 1) Detective Nagle lied to the Fire Investigation Team about whether he spoke to any witnesses or about what the witnesses actually said, or 2) the Fire Investigation Team fabricated the portion of the Report which stated that Detective Nagle had statements indicating that eyewitnesses saw someone "placed paper towels in between the drop ceiling and lit the paper."  (Fire Investigation Team Report 1.)

In sum, "[c]onsidering all of the evidence, a reasonable jury could conclude that the contents of [the Report] were fabricated."  *Marom*, 2019 WL 3338141, at *9; *see also Kee*, 12 F.4th at 171 ("Thus, construing the evidence most favorably to [the plaintiff], there is a triable issue as to whether [the] [d]etective [] created false statements that were conveyed to the [prosecutor] to support the charges in the criminal complaint . . . ."); *Bellamy*, 914 F.3d at 746 (denying summary judgment on fabrication of evidence claim where the absence of an incriminating statement in the detective's report, coupled with the plaintiff's denial of making that statement, "support[ed] an inference of fabrication.").  Accordingly, Defendants' Motions for summary judgment on Plaintiff's fabrication of evidence claim are denied.

### b.  *Brady*

"[A] fair trial claim can [also] arise when police or prosecutors withhold material exculpatory or impeaching evidence from a defendant."  *Hincapie v. City of New York*, 434 F. Supp. 3d 61, 75 (S.D.N.Y. 2020) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).  "To prevail on a *Brady* claim, a plaintiff must demonstrate that: (1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the State; and (3) prejudice ensued."  *Id.* (quoting *Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir. 2001) (quotation marks and alterations omitted)).

Plaintiff argues that Defendants "violated [Decedent's] *Brady* rights by suppressing three categories of material from the District Attorney: (1) the impeaching information concerning their fire investigation, (2) the falsity of their fire investigation reports, and (3) the falsity of their representations and omissions to prosecutors."  (Pl.'s Opp'n – Putnam Defs.'16.)

However, Plaintiff does not distinguish his *Brady* claim from his fabrication of evidence and malicious prosecution claims, given that they are based on the same underlying facts.  (*See, e.g.*, Pl.'s Opp'n – Putnam Defs. 15–18.)  "Several courts in the Second Circuit have [] found that *Brady* claims are duplicative of both fair trial and malicious prosecution claims where the alleged underlying conduct is the same. . . ."  *Hutchins v. Solomon*, No. 16-CV-10029, 2018 WL 4757970, at *18 (S.D.N.Y. Sept. 29, 2018); *see also Deanda v. Hicks*, 137 F. Supp. 3d 543, 578 (S.D.N.Y. 2015) ("[I]n this context, [the] [p]laintiff's claim of a *Brady* violation is duplicative of her malicious prosecution claim").  Defendants' Motions for summary judgment on Plaintiff's *Brady* claim are therefore granted.

### 3.  Malicious Prosecution

"To prevail on a malicious prosecution claim under New York law and federal law, a plaintiff must show: (1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice."  *Kee*, 12 F.4th at 161–62 (quotation marks omitted).  "For a malicious prosecution claim under [§] 1983, a plaintiff also must demonstrate a sufficient post-arraignment liberty restraint."  *Id.* (quotation marks omitted).

First, Putnam Defendants argue that Plaintiff has failed to establish the initiation element. (*See* Putnam Defs.' Mem. 12–13.)  "A defendant initiates a proceeding when []he 'play[s] an

active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Torres v. City of New York*, No. 20-CV-4007, 2022 WL 955152, at *6 (E.D.N.Y. Mar. 30, 2022) (quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000)). "An arresting officer may also be held liable for malicious prosecution if []he creates false information likely to influence a jury's decision and forwards that information to prosecutors." *Id.* (quotation marks and alterations omitted). "Showing that the police failed to make a complete and full statement of facts to the District Attorney, misrepresented or falsified evidence, withheld evidence or otherwise acted in bad faith satisfies the initiation element of malicious prosecution." *Id.* (quotation marks omitted).

Here, construing the facts in the light most favorable to Plaintiff, the Court finds that a reasonable jury could find that the Defendants initiated and/or continued the prosecution against Decedent. Several facts support Plaintiff's version of events. First, Nagle stated during his deposition that the decision to arrest Decedent "was based on motive, witness statements, video, [Decedent] being the only one in the bathroom, and the results of the fire investigation team, and then a consultation with [Assistant District Attorney ("ADA") Charbonneau." (Decl. of Peter F. Harrington, Esq. in Supp. of Johnson's Mot. ("Harrington Decl.") Ex. E ("Nagle Dep. Tr. 1") 115:18–21 (Dkt. No. 162-8).)[7] Thus, the decision to arrest Decedent was made at least in part after a consultation with ADA Charbonneau, which presumably required Nagle to summarize the facts of the investigation. Second, Geoghegan stated at his deposition, "I hand delivered everything I had to the district attorney's office upon [] request." (Geoghegan Dep. Tr.

---

[7] Plaintiff also attached excerpts of the transcript of Detective Nagle's deposition as an exhibit to their Opposition to the Putnam Defendants' Motion for Summary Judgment. (*See generally* Nagle Dep. Tr. 2.)

56:11–12.)  Third, as discussed, ADA Noah stated at his deposition that he relied at least in part

on the Report in going forward with the prosecution of Decedent:

> Q:     Would it be fair to say that you would have relied on the completeness and
>        the accuracy of Mr. Geoghegan and Mr. Efferen's investigation and the
>        conclusions that the fire was an arson in the presentation of your case to the
>        grand jury?
>
> . . .
>
> A:     I believe they would have been a contributing factor.

(Noah Dep. Tr. 94:10–18.)  The Report's conclusion that the fire was incendiary was therefore at

least a "contributing factor" in the prosecution's decision to present Decedent's case to the grand

jury.  *See Torres*, 2022 WL 955152, at *7 (finding that where the defendant officer met with the

ADA, "[i]f she did indeed fail to make a complete and full statement of facts to the Assistant

District Attorney, this is enough for her to have participated in the initiation of a claim"

(quotation marks omitted)); *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 606 (E.D.N.Y.

2017) (finding the initiation element met and noting that the defendant officers "cannot hide

behind the decision of the DA to prosecute when they, according to [the] [p]laintiff's allegations,

provided the prosecutor with false information" (quotation marks omitted)).

    Moreover, Nagle and Geoghegan are "alleged to have subsequently testified falsely

against [Decedent] during the [] criminal trial."  *Davis v. City of New York*, 296 F.R.D. 127, 130

(E.D.N.Y. 2013).  (*See* Pl.'s Opp'n – Putnam Defs. 24–25.)  "Should a jury credit [P]laintiff's

version of events, [D]efendants' wrongdoing could suffice to satisfy the initiation or continuation

element of a malicious prosecution claim."  *Davis*, 296 F.R.D. at 130.  "These allegations,

accepted as true, support a reasonable inference that the prosecution would not have continued

had the [Defendants] not testified falsely."  *Buari v. City of New York*, 530 F. Supp. 3d 356, 385

(S.D.N.Y. 2021).  The question of whether Defendants' or Plaintiff's version of events should be

credited "can only be resolved by evaluating the credibility and probative weight of [each Party's] account, and that assessment can only be made by a jury." *Dufort v. City of New York*, 874 F.3d 338, 351 (2d Cir. 2017) (vacating district court's decision to grant summary judgment to the defendants on the plaintiff's malicious prosecution claim).  The Court therefore finds that that a genuine dispute of material fact exists with respect to the initiation element.

Because Defendants do not appear to dispute the favorable termination element, (*see generally* Putnam Defs.' Mem; Carmel Defs.' Mem.; Johnson's Mem.), the Court will proceed to the probable cause element.  "Because the lack of probable cause is an element of a malicious prosecution claim, 'probable cause is a complete defense against a claim for malicious prosecution.'" *Hernandez v. County of Nassau*, No. 17-CV-1646, 2022 WL 513929, at *8 (E.D.N.Y. Feb. 20, 2022) (quoting *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021)).  "Probable cause, in the context of malicious prosecution, has . . . been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003).  Thus, "[t]he probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases." *Stansbury v. Wertman*, 721 F.3d 84, 95 (2d Cir. 2013).

The Court has already found that a genuine dispute of material fact exists as to whether Defendants falsified the Report and whether their conclusion that the fire was incendiary was fabricated.  *See supra* II.B.2.a.  It is clear from the record that there is some evidence that Defendants relied on this allegedly fabricated evidence in presenting the case to the grand jury and at trial.  For example, Nagle testified in the grand jury:

[A]:   There would be no other reason—there is [sic] no electrical wires up there—there would be no other reason—unless someone starting a fire—that something would combust in that area.

> Q:     In your opinion?
>
> A:     Based—I went to Arson School for a week and based on the [Fire
>         Investigation Team] their training and expertise, they concluded there
>         would be no other reason that a fire would start there other than someone
>         starting it.

(Pl.'s Opp'n – Putnam Defs. Ex. H ("Grand Jury Tr.") 39:14–23 (Dkt. No. 169-14).)  Similarly,

Geoghegan testified during Decedent's criminal trial that the fire could not have been electrical,

and that the Fire Investigation Team eliminated that possibility through their investigation:

> Q:     Was there anything around the origin point that would lead you to believe
>         that this was electrical in any way?
>
> A:     No, sir.

(Pl.'s Opp'n – Putnam Defs. Ex. G ("Trial Tr.") 846:24–847:3 (Dkt. No. 169-13).)  However, as

discussed above, there is a notation in the Fire Investigation Team's notes indicating that the

team failed to inspect the electrical panel: "Tripped / Blown: Panel Not Inspected."  (Fire

Investigation Team Notes.)  Construing the evidence in the light most favorable to Plaintiff, this

creates at least the inference that Geoghegan and Efferen fabricated their conclusion that the fire

could not have been electrical.

Additional evidence suggests that Defendants intentionally misled the prosecutors into

believing there was probable cause to prosecute Decedent.  As discussed, although Geoghegan

stated that he expressed concern that the scene of the fire had been unsecured for 13 hours, he

failed to include that fact in the Report.  (Geoghegan Dep. Tr. 27:19–28:24.)  Together, these

two facts create the inference that the Fire investigation Team fabricated their conclusion that the

fire could not have been accidental or natural.  Finally, although the Report states that "Detective

Nagle informed the team that he had statements from witnesses present at the time of the incident

that a male had placed paper towels in between the drop ceiling and lit the paper," (Report),

Nagle stated at his deposition that he had no such statements, creating the inference that these statements were fabricated, (Nagle Dep. Tr. 2, at 95:21–96:2, 98:2–13).

"[T]he presumption of probable cause established by a grand jury indictment may be rebutted by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Stansbury*, 721 F.3d at 95 (alterations and quotation marks omitted). "A plaintiff may demonstrate fraud or perjury through 'evidence establishing that the [] witnesses have not made a complete and full statement of facts either to the [g]rand [j]ury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith.'" *Ying Li*, 246 F. Supp. 3d at 612 (citation omitted).

The Court therefore finds that a genuine dispute of material fact exists as to whether there was probable cause to prosecute Decedent. *See Anilao v. Spota*, 774 F. Supp. 2d 457, 494 (E.D.N.Y. 2011) (finding that the plaintiff sufficiently overcame the presumption of probable cause by alleging that the grand jury indictment was based on falsified evidence and testimony); *Brandon v. City of New York*, 705 F. Supp. 2d 261, 273–74 (S.D.N.Y. 2010) (denying summary judgment to defendant with respect to malicious prosecution claim where jury could reasonably find that the indictment was secured through bad faith or perjury).

Finally, as for the malice element, "[m]alice may be inferred [] from the absence of probable cause." *Franco v. Gunsalus*, No. 16-CV-634, 2022 WL 93570, at *6 (N.D.N.Y. Jan. 10, 2022) (quoting *Dufort*, 874 F.3d at 353). Thus, "[l]ack of probable cause generally raises an inference of malice sufficient to withstand summary judgment." *Torres*, 2022 WL 955152, at *9 n.6 (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997)); *see also Boyd*, 336 F.3d at 78 ("Once we find an issue of material fact as to probable cause, the element of

malice also becomes an issue of material fact as well.  A lack of probable cause generally creates an inference of malice.").

In sum, therefore, Defendants are not entitled to summary judgment on Plaintiff's malicious prosecution claim, and Defendants' Motions on that claim are denied.

### 4.  *Monell*

"[T]o prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury."  *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–91 (1978)), *cert. denied*, 558 U.S. 933 (2009).  The fifth element reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor."  *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right.").  In other words, a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (italics omitted); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity itself commits a wrong" (emphasis omitted)).  Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988)

26

("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

"In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.'" *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003). A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted). When relying on the second of these theories (i.e., the actions of a policymaker) to establish municipal liability, a plaintiff must allege that the official is a "final policymaker for the local government in a particular area . . . involved in the action." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (alteration, citation, and quotation marks omitted); *see also Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 737 (1989) (explaining that a policymaker must "have the power to make official policy on a particular issue"). "It is well settled that municipal liability may be established based on the single acts of a municipal official with 'final policymaking authority.'" *Canzoneri v. Inc. Vill. of Rockville Ctr.*, 986 F. Supp. 2d 194, 204 (E.D.N.Y. 2013) (quoting *Praprotnik*, 485 U.S. at 123). In the Second Circuit, an official has final authority "if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." *Roe*, 542 F.3d at 38 (citation and quotation marks omitted). Accordingly, where a policymaker wholly delegates certain policy powers to a subordinate, the subordinate

27

may herself qualify as a policymaker, thus subjecting the municipality to liability.  *See Stalter v. County of Orange*, No. 15-CV-5274, 2016 WL 8711397, at *11 (S.D.N.Y. Aug. 5, 2016) (finding that a plaintiff adequately pleaded that a sheriff had "delegated all final policy-making authority as to disciplinary matters" to an undersheriff, and thereby sufficiently pleaded a *Monell* action based on the undersheriff's conduct (record citation and quotation marks omitted)); *Lathrop v. Onondaga County*, 220 F. Supp. 2d 129, 138 (N.D.N.Y 2002) (holding that a Deputy Commissioner of the New York State Division of Criminal Justice Services ("DCJS") had final policymaking authority with respect to employment decisions, because the Commissioner left such decisions to the Deputy, spent little time reviewing such matters, and the Deputy understood himself as autonomous).  The Second Circuit has also explained that "[w]here a city official has final authority over significant matters involving the exercise of discretion, his choices represent government policy."  *Gronowski v. Spencer*, 424 F.3d 285, 296 (2d Cir. 2005) (citation and quotation marks omitted).  Further, "the official in question need not be a municipal policymaker for all purposes.  Rather, with respect to the conduct challenged, he must be responsible under state law for making policy in that area of the municipality's business."  *Jeffes*, 208 F.3d at 57 (citation, emphasis, and quotation marks omitted).

Plaintiff argues that "Putnam County, through its Bureau of Emergency Services, delegated to Geoghegan and Efferen final policymaking authority with respect to assisting [Chief Johnson] with the determination of whether a fire was an arson."  (Pl.'s Opp'n – Putnam Defs. 21.)  In support of this argument, Plaintiff points to Putnam County Code § 52-1, which provides that the "Commissioner of the Bureau of Emergency Services shall, with respect to County Emergency Services matters insure proper emergency response to all natural and man-made emergencies."  Putnam Cnty. Code § 52-1(C).  Plaintiff further cites to the Putnam County Fire

Investigation Team Standard Operating Guidelines ("Standard Operating Guidelines"), which appear to have been created by the Putnam County Bureau Emergency Services.  (*See generally* Pl.'s Opp'n – Putnam Defs. Ex. R ("Standard Operating Guidelines") (Dkt. No. 169-23).)  The Standard Operating Guidelines provide that the Fire Investigation Team's purpose is to "provide Fire Departments and others with a comprehensive and professional fire Investigation"; "assist law enforcement arson investigators when requested"; "contact the appropriate law enforcement agency after identifying, photographing, and preserving evidence if a fire is determined to be incendiary in origin"; and "submit all evidence to the appropriate law enforcement agency responsible for prosecution and to assist when requested in the preparation of court testimony."  (*Id.* at 6.)  The Standard Operating Guidelines further provide that 'Fire Investigators shall be responsible for providing fire departments with a proper fire investigation," noting that "Fire Investigation Team members shall conduct all investigations as criminal investigations to eliminate the potential for legal mistakes."  (*Id.* at 8.)  Additionally the Standard Operating Guidelines state that "[a] fire determination is confidential and shall be distributed only to the Incident Commander and/or Jurisdictional Chief.  Under no circumstances should anyone else be informed of a determination unless so directed by the Incident Commander."  (*Id.* at 9.)  Finally, "[r]eports must be timely, concise, coherent and complete."  (*Id*.)

Plaintiff also points to a March 12, 2009 letter addressed to Decedent from Robert McMahon ("McMahon"), then Commissioner of the Putnam County Bureau of Emergency Services, in which he describes the role of the Fire Chief and the Fire Investigation Team.  (*See generally* Pl's Opp'n – Putnam Defs. Ex. S ("McMahon Letter") (Dkt. No. 169-24).)  As McMahon described it, the fire investigators:

> assist the [F]ire [C]hief in his determination as to whether the fire, in his opinion, was suspicious, incendiary or accidental.  (The Fire Chief is charged with making

a determination of accidental, suspicious, or incendiary after every fire.) . . . [If] the determination is made that the fire is suspicious or incendiary (perhaps set or definitely set) the Chief will turn it over to the investigating police agency. . . . The investigators may [] be called to testify as to their findings and present their credentials to the court as a qualified or experienced investigator.

(*Id.* at 1.)  Geoghegan stated in his deposition that this letter accurately reflected his understanding of his role, adding that no one reviewed the Fire Investigation Team's decisions or actions at the scene with respect to the assistance they provided to Chief Johnson.  (*See* Geoghegan Dep. Tr. 46:4–7.)  Geoghegan further explained the decision-making process, describing it as "a consensus of all team members that are present, discuss what they found, because everybody has a specific role. And we come to a consensus on possible cause of the fire, whether it be incendiary, accidental, or natural." (*Id.* at 43.)  Additionally, Geoghegan stated:

> Q:      And is it fair to say that the Bureau of Emergency Services would defer to the on-scene investigators such as yourself?
>
> A:      Yes.
>
> Q:      And that would have been the policy or the custom back in 2007 when you investigated the Smalley's fire; correct?
>
> A:      Correct.

(*Id.* at 47:1–7.)  Similarly, Efferen agreed during his deposition that the Bureau of Emergency Services defers to on-scene fire investigators with respect to their determinations about the cause of fires.  (*See* Pl's Opp'n – Putnam Defs. Ex. E ("Efferen Dep. Tr.") 104:5–22 (Dkt. No. 169-9).)

Cases within the Second Circuit and beyond have found that final policymaking authority to be delegated in situations similar to this one.  In *Lathrop*, the court found that the DCJS Commissioner delegated final policymaking authority to the Deputy Commissioner with respect to the Office of Public Safety where the Commissioner testified that she "spends very little time on issues relating to the Office of Public Safety," and that the Deputy Commissioner was the

"primary decision maker with respect to the functions within the Office of Public Safety."
*Lathrop*, 220 F. Supp. 2d at 138.  In that case, the Deputy Commissioner testified that he made
decisions relevant to the Office of Public Safety "based upon information provided to him by his
staff."  *Id.*  Similarly, "[i]n *Rookard v. Health & Hospitals Corp*., 710 F.2d 41 (2d Cir. 1983), the
Second Circuit concluded that the Executive Director and the Vice President for Corporate
Affairs of a hospital were final policymakers for employment decisions, relying in part on the
fact that their superior, when sent evidence that the plaintiff was removed from her position for
uncovering fraud at the hospital, referred the evidence to the Executive Director."  *McDonald v.
Bd. of Educ. of City of New York*, No. 01-CV-1991, 2003 WL 21782685, at *5 (S.D.N.Y. July
31, 2003) (citing *Rookard*, 710 F.2d at 45–46).  In another case, the court in *Cyr v. Addison
Rutland Supervisory Union* found that school board had delegated final policymaking authority
to the school superintendent, noting that because the school board "members did not believe they
had the power to contravene the notices against trespass suggests [that the] [s]uperintendent []
had final policymaking authority over the issuance of notices against trespass."  60 F. Supp. 3d
536, 555 (D. Vt. 2014) (citing *Rookard*, 710 F.2d at 46).

Based on this line of cases and the evidence on which Plaintiff relies, Plaintiff has
demonstrated that Chief Johnson was a final policymaker with respect to the decision of whether
a fire was natural or incendiary.  Specifically, as the Standard Operating Guidelines, the
Commissioner's letter, and the deposition testimony of Geoghegan and Efferen make clear,
Chief Johnson, assisted by Geoghegan and Efferen, was primarily responsible for determining
the cause of a fire and forwarding relevant information to the proper authorities.  Whether
Geoghegan and Efferen were also final policymakers presents a closer question.  However, even
if a reasonable jury could not find that Putnam delegated final policymaking authority to

Geoghegan and Efferen, "a municipality is liable where the policymaker ratifies a subordinate's decisions or acts." *Lathrop*, 220 F. Supp. 2d at 136 (citation and quotation marks omitted). Thus, "[i]n light of the evidence that [Chief Johnson] has final authority with respect to [determining the cause of a fire,] Defendants have not shown that they are entitled to summary judgment on Plaintiffs' *Monell* claims . . . ." *Barzilay v. City of New York*, ___ F. Supp. 3d. ___, No. 20-CV-4452, 2022 WL 2657169, at *44 (S.D.N.Y. July 8, 2022).  Defendants' Motions are therefore denied with respect to Plaintiff's *Monell* claims.

### 5. Conspiracy

"To prove a § 1983 conspiracy, a plaintiff must show: '(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.'" *Kalamaras v. Cnty. of Nassau*, No. 17-CV-1068, 2019 WL 4452281, at *19 (E.D.N.Y. Sept. 16, 2019) (quoting *Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002)).  "However, because conspiracies are by their very nature secretive operations, they may have to be proven by circumstantial, rather than direct, evidence." *Amato v. Hartnett*, 936 F. Supp. 2d 416, 440 (S.D.N.Y. 2013) (quotation marks and alteration omitted).  Additionally, "[i]t is well settled that a conspiratorial agreement can simply be a 'tacit understanding,' . . . and a person 'can be a conspirator by agreeing to facilitate only some of the acts leading up to the substantive offense.'" *Peacock v. City of Rochester*, No. 13-CV-6046, 2016 WL 2347448, at *11 (W.D.N.Y. May 4, 2016) (first quoting *United States v. Sabhnani*, 599 F.3d 215, 244 (2d Cir. 2010); and then quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)).

Plaintiff argues that "[a] reasonable jury could find a meeting of the minds between Detective Nagle and Chief Johnson . . ., Geoghegan and . . . Efferen . . . , and Porto, to falsely

arrest and convict Haughey." (Pl.'s Opp'n – Putnam Defs. 24.)  The Court agrees.  As discussed

above, the Court has already found that a reasonable jury could find for Plaintiff on his

fabrication of evidence and malicious prosecution claims.  Crediting the Plaintiff's evidence, a

reasonable jury could similarly find that Defendants knowingly concluded that the fire was

incendiary after conducting a shoddy investigation, as part of a joint effort to falsely accuse

Plaintiff of starting the fire.  First, Nagle spoke to Porto when he arrived at Smalley's after the

fire on the night of March 7, 2007.  (*See generally* Nagle Dep. Tr. 2, at 62.)  Second, as the

Report states,

> Detective Nagle informed F.I.T. members present and Chief Johnson that at
> approximately 0100 hours on 03-10-07 a male had allegedly tried to set a fire in the
> Men's Room at Smalley's [I]nn. . . . .  Detective Nagle informed the team that he
> had statements from witnesses present at the time of the incident that a male had
> placed paper towels in between the drop ceiling and lit the paper.

(Fire Investigation Team Report 1.)  According to Tulipane, by informing Johnson, Geoghegan,

and Efferen that he believed someone had started the fire, Nagle "prejudice[d] . . . the

investigation." (Tulipane Expert Report 12.)  Third, as Geoghegan stated at his deposition, it

was "questionable" that Smalley's was not secured for approximately 13 hours between the time

that the fire occurred and the time that the Fire Investigation team arrived on the scene:

> Q:   What did you say, to your recollection, to Mr. Nagle when he gave you that
>      information [about what had occurred]?
>
> A:   I said, well, it's been 13 hours-plus since this happened.  I said the scene
>      hasn't been protected.  So if it's a crime scene, it's—you know, it's
>      questionable because no one secured the scene for over 13 hours.

(Geoghegan Dep. Tr. 28:18–24.)  Tulipane stated in his expert report that this 13-hour gap in

which the scene was unsecured further compromised the integrity of the investigation.  (Tulipane

Expert Report 12.)  Fourth, the evidence indicates that the Fire Investigation Team did not

adequately inspect the electrical system, casting doubt on their conclusion that they ruled out all

natural or accidental causes of the fire.  (*See* Fire Investigation Team Notes (indicating that the electrical panel was not inspected).)  Fifth, Nagle consulted with the prosecutor prior to making the decision to arrest Plaintiff.  (*See* Nagle Dep. Tr. 1, at 115:21.)  Sixth, Nagle testified before the grand jury.  (*See generally* Grand Jury Tr. 39).  Seventh and finally, Geoghegan met with the prosecutor prior to the trial, and both Geoghegan and Nagle testified at Plaintiff's criminal trial. (*See* Geoghegan Dep. Tr. 130:2–7; Trial Tr. 964:13–16.)

Courts within the Second Circuit have denied summary judgment for conspiracy claims in analogous circumstances.  For example, in *Deskovic v. City of Peekskill*, the court denied summary judgment on the plaintiff's conspiracy claim where the evidence indicated an agreement between City of Peekskill police officers and an investigator with the Putnam County sheriff's office in order to elicit a false confession from the plaintiff during a polygraph exam. *See* 894 F. Supp. 2d 443, 466, 474 (S.D.N.Y. 2012).  The court noted that "the manner in which the polygraph examination was conducted suggests that [the investigator] conducted the exam to elicit a confession.  [The investigator] employed methods and techniques that he arguably knew could produce unreliable results . . . ."  *Id.* at 466.  Similarly, in *Charles v. County of Nassau*, the court concluded that the plaintiff had raised a genuine dispute of material fact as to whether the defendants had conspired to falsely arrest and prosecute the plaintiff.  No. 11-CV-2709, 2015 WL 10457215, at *13 (E.D.N.Y. Feb. 20, 2015), *report and recommendation adopted*, 116 F. Supp. 3d 107 (E.D.N.Y. 2015).  Additionally, in *Terry v. Hulse*, the court found that there was a genuine dispute of material fact as to whether the defendants "conspired to cover up the alleged use of excessive force against" the plaintiff.  No. 16-CV-252, 2018 WL 4682784, at *13 (S.D.N.Y. Sept. 28, 2018).  The court specifically pointed to a conversation between two of the defendants, who were corrections offices, in which they discussed not letting the facility

superintendent see close-up photos of the plaintiff's injuries.  *See id.*; *see also DeMeo v. Kean*, 754 F. Supp. 2d 435, 447 (N.D.N.Y. 2010) (finding that erased and destroyed video recordings in control of defendants was "sufficient circumstantial evidence to permit a jury to determine whether [the defendants] conspired . . . to partially erase and/or destroy the video evidence.").

"Based on this evidence, Plaintiff has created a fact dispute regarding whether there was an agreement between" Defendants with respect to the cause of the fire.  *Terry*, 2018 WL 4682784, at *13.  That is, a reasonable jury could find that Defendants conspired to falsely accuse Plaintiff of setting the fire.  "Plaintiff has also provided details of time and place and the alleged effects of the conspiracy, . . . as well as overt acts which Defendants engaged in which were reasonably related to the promotion of the alleged conspiracy."  *Id.* (quotation marks, citations, and alterations omitted); *see also Leung v. Town of Oyster Bay*, No. 16-CV-4356, 2019 WL 5309995, at *11 (E.D.N.Y. Oct. 21, 2019) (denying summary judgment on the plaintiffs' conspiracy claim where "the [p]laintiffs submitted evidence that [t]own employees were not acting in accordance with their official duties"); *Gutierrez v. City of New York*, No. 15-CV-9907, 2019 WL 1427391, at *3 (S.D.N.Y. Mar. 29, 2019) (denying summary judgment on the plaintiff's conspiracy claims); *Peacock*, 2016 WL 2347448, at *11 (denying summary judgment on the plaintiff's conspiracy claims where "there are disputed issues of material fact regarding whether [one defendant] knew [another defendant] had fabricated [the] [p]laintiff's confession and implicitly condoned the misconduct by not alerting the prosecutor or anyone else to [the] deception").

The Court therefore finds that Defendants are not entitled to summary judgment with respect to the Plaintiff's conspiracy claims.

6.  Personal Involvement

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (collecting cases); *see also Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (a § 1983 plaintiff must establish "that each Government-official defendant, through the official's own individual actions, has violated the Constitution" (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009))).  To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Grullon*, 720 F.3d. at 139 (alterations, italics, and quotation marks omitted).

The Putnam Defendants argue that "Plaintiff does not allege, and does not have any evidence, that Casey was personally involved in the fire investigation, [Decedent's]Plaintiff's arrest, or prosecution," "other than the fact that he was present outside Smalley's on March 11, 2007."  (Putnam Defs.' Mem. 18–19.)  Plaintiff does not appear to dispute this argument.  (*See generally* Pl.'s Opp'n – Putnam Defs.)  Thus, as discussed above, Plaintiff's claims against Casey are deemed abandoned and therefore dismissed.  *See Fujian Ocean Shipping*, 2022 WL 902668, at *6 ("[F]ederal courts have found that a [party] abandons their claim when they fail to address it in their opposition papers to summary judgment." (second alteration in original) (citation omitted)); *Ragland*, 2022 WL 580923, at *7 ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing

36

summary judgment fails to address the argument in any way."); *Cooper*, 925 F. Supp. 2d at 601 ("[The] [p]laintiffs have failed to oppose [the] [d]efendants' motion [for certain claims]. . . . Therefore, [the] [p]laintiffs are deemed to have abandoned such claims, and they are hereby dismissed.").

Next, Johnson argues that "the uncontroverted evidence clearly establishes that Johnson did not directly participate in any of the alleged unlawful conduct." (Johnson's Mem. 13.)  The Court disagrees.  Johnson does not dispute that he, as the Chief of the Carmel Fire Department, responded to Smalley's on the morning after the fire.  (*See* Johnson's 56.1 ¶ 19.)  And as discussed above, McMahon, the Commissioner of the Putnam County Bureau of Emergency Services, wrote in a letter to Decedent that the "Fire Chief is charged with making a determination of accidental, suspicious, or incendiary after every fire," and that the fire investigators assist the Chief in making that decision.  (McMahon Letter.)  Additionally, Geoghegan stated in his deposition that this letter accurately reflected his understanding of his role as a fire investigator vis- à-vis Chief Johnson, adding that the fire investigators and the Fire Chief "come to a consensus on possible cause of the fire, whether it be incendiary, accidental, or natural."  (Geoghegan Dep. Tr. at 43:7–8.)  Further, contemporaneous reports reflect that Johnson played an active role in the investigation.  For example, the Report mentions Johnson several times, indicating that he played an active role in the investigation:

> On Saturday, March 10, 2007 at approximately 1400 hours the Fire Investigation Team was request to respond to [Smalley's] by Carmel Police Department (CPD) Detective Michael Nagle.  Carmel Fire Department (CFD) *Chief Daryl Johnson was notified and responded*.  The Fire Investigation Team arrived on scene at 1405 hours.  CPD Detective Michael Nagle and CFD Chief Daryl Johnson arrived on scene a few moments later.  *Detective Nagle informed F.I.T. members present and Chief Johnson* that at approximately 0100 hours on 03-10-07 a male had allegedly tried to set a fire in the men's room at Smalley's Inn. . . . Efferen and Chief Johnson also viewed surveillance video of the incident that was taken by security cameras in the bar area. . . . *The Team, along with CFD Chief Johnson examined the men's*

> *room* and found one drop ceiling tile missing in the area directly above the urinal
> and toilet."

(Fire Investigation Team Report 1 (emphasis added).)  Thus, there is ample evidence that

Johnson "participated directly" in the alleged violations of Plaintiff's constitutional rights.  *See*

*Grullon*, 720 F.3d. at 139.  Indeed, "a reasonable jury could conclude that [Plaintiff] has satisfied

[§] 1983's 'personal involvement' requirement with respect to [Johnson] because there is []

evidence that [Johnson] [participated in the investigation and] creat[tion] of [the Report]."

*Marom*, 2019 WL 3338141, at *11.  Even if Johnson did not himself make the determination that

the fire was incendiary and instead relied on Geoghegan and Efferen's conclusion, the Court

finds that is sufficient for a fact finder to conclude that Johnson participated in the conduct

underlying Plaintiff's claims.  *See, e.g.*, *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir.

2001) (noting that "direct participation" includes "ordering or helping others to do the unlawful

acts, rather than doing them [oneself]").  Thus, Johnson cannot escape liability under [§] 1983

for lack of personal involvement.

### 7.  Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223,

231 (2009) (quotation marks omitted).  Qualified immunity shields a defendant from standing

trial or facing other burdens of litigation "if either (a) the defendant's action did not violate

clearly established law, or (b) it was objectively reasonable for the defendant to believe that his

action did not violate such law."  *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250

(2d Cir. 2001) (quotation marks omitted).

The Supreme Court has held that when evaluating an asserted qualified immunity defense, a court may begin by examining whether a reasonable officer in Defendants' position would have believed his or her conduct would violate the asserted constitutional right.  *See Pearson*, 555 U.S. at 236 (*overruling Saucier v. Katz*, 533 U.S. 194 (2001)), and explaining that judges are no longer required to begin by deciding whether a constitutional right was violated but are instead "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first").  The Supreme Court has further instructed that "[t]o be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right.  In other words, existing precedent must have placed the statutory or constitutional question beyond debate."  *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (second alteration in original) (citations and quotation marks omitted).  Furthermore, "the right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official."  *Id*. at 665 (citations and quotation marks omitted).  Thus, to determine whether a right is clearly established, courts must determine "whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful."  *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011) (citation omitted).

Because the Court has already denied summary judgment on the merits of Plaintiff's fair trial, malicious prosecution, and conspiracy claims, the Court finds that granting summary judgment to Defendants on these claims on qualified immunity grounds would be similarly inappropriate.  *See Deskovic*, 894 F. Supp. 2d at 455, 461–62, 467 (denying qualified immunity to defendants where the court had already found a genuine dispute of material fact as to the

plaintiff's fabrication of evidence, malicious prosecution, and conspiracy claims); *see also Dufort*, 874 F.3d at 354 (concluding that "it would be inappropriate to grant qualified immunity to the[] [d]efendants at the summary judgment stage" where the plaintiff "established a dispute of material fact as to whether the [d]efendants intentionally withheld or manipulated key evidence during his arrest and prosecution."); *Torres*, 2022 WL 955152, at *9 n.6 ("[The] [d]efendants' argument that they are entitled to qualified immunity cannot save them as summary judgment is only appropriate if 'there is no dispute as to the pertinent events and the knowledge of the officers.' . . .  Here, there are factual disputes as to the knowledge [the defendants] and the pertinent events." (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996))); *Mingo v. Augustyn*, No. 19-CV-211, 2022 WL 224645, at *8 (W.D.N.Y. Jan. 26, 2022) ("Because th[e] [c]ourt agrees that [the plaintiff] has identified genuine issues of fact about whether the charges against [the plaintiff] were supported by probable cause, th[e] [c]ourt concludes that [the defendant is] not entitled to qualified immunity for [the plaintiff's] malicious prosecution claim at this stage."); *Buari*, 530 F. Supp. 3d at 396 ("The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right.") (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991))).

Accordingly, the declines to grant qualified immunity to Defendants at the summary judgment stage.

<u>III.  Conclusion</u>

For the foregoing reasons, Defendants' Motions for Summary Judgment are denied in large part, except that Plaintiff's false arrest claim is dismissed as untimely and abandoned, Plaintiff's *Brady* claim is dismissed as duplicative, and all claims against Defendant Casey are dismissed.  The Clerk of the Court is respectfully directed to terminate the pending Motions, (Dkt. Nos. 153, 156, 159).  The Court will hold a status conference on October 27, 2022, at 12:00 p.m.

SO ORDERED.

DATED:        September 26, 2022
                       White Plains, New York

                                                                  _____
                                                                  KENNETH M. KARAS
                                                                  UNITED STATES DISTRICT JUDGE